STATE of Wisconsin, Plaintiff-Respondent-Petitioner,

v.

Ronald FILLYAW, Defendant-Appellant.

Supreme Court

*No. 79–840–CR.  Argued October 7, 1981.—*
*Decided December 1, 1981.*

(Also reported in 312 N.W.2d 795.)

For the petitioner the cause was argued by *Sally L. Wellman,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Jack E. Schairer,* senior assistant state public defender.

COFFEY, J.   This is a review of a decision of the court of appeals reversing a judgment and order of the circuit court for Milwaukee county, HON. HAROLD B. JACKSON, JR., presiding.[1]  Defendant-appellant Ronald Fillyaw was convicted of first-degree murder, contrary to sec. 940.01, Stats. Fillyaw appealed, claiming that the trial court erred in refusing to suppress various items of physical evidence allegedly obtained in violation of his

[1] Although the court of appeals' decision indicates that this was an appeal from both a judgment and order, a review of the record demonstrates that this is incorrect. In an order dated December 4, 1979, the court of appeals dismissed the defendant's appeal from the order denying his post-conviction motions. The basis for this dismissal was the fact that the order was entered after the appeal from the judgment of conviction was filed. Upon perfection of the initial appeal, the trial court lost jurisdiction to decide the sec. 974.02, Stats., motion. *See: State v. Engel,* 208 Wis. 600, 243 N.W. 223 (1937), and *State v. Jakubowski,* 61 Wis. 2d 220, 212 N.W.2d 155 (1973). Therefore, this is properly an appeal only from the judgment of conviction. This procedural inaccuracy does not affect the issues raised on appeal.

constitutional rights and in refusing to suppress statements allegedly made by Fillyaw without the benefit of his *Miranda*[2] warnings. The court of appeals reversed, holding that prejudicial error was committed by the trial court when it admitted into evidence the bloodstains found on the floor during a warrantless search of the murder victim's apartment as the search and seizure were unconstitutional. The appellate court determined that Fillyaw had standing to challenge the search and thus held the search and seizure unconstitutional.

On February 2, 1977, at approximately 11:45 a.m., Officer Robert Drakos was dispatched to a garage at 1820 North 1st Street in Milwaukee to investigate a report that a dead body had been found in the garage. Drakos' investigation confirmed that there was a dead female body lying on some cement blocks and rubbish in the garage. He summoned the Detective Bureau to investigate.

Sometime between noon and 12:30 p.m. on February 2, 1977, while Drakos was securing the garage area, he was approached by Fillyaw who stated that he was staying at 116–C East Vine Street and saw all the commotion and wanted to find out what was going on.[3] He was concerned because his girl friend was missing and he was taking care of her children. He went on to explain that he was at his girl friend's mother's house at about 8 p.m. on February 1, 1977, when he received a call from his girl friend, Wanona Jarrett, who lived at 116–C E. Vine Street, who asked him if he would come over and "watch her kids" because she wanted to go out. Wanona Jarrett's mother lived at 204 East Vine Street. Fillyaw further stated that he went over to watch the children and fell asleep before she went out for the evening.

[2] *Miranda v. Arizona,* 384 U.S. 436 (1966).
[3] 116–C East Vine Street is located only five to ten yards from the garage.

At this point in the conversation, Drakos asked Fillyaw his address and for a description of the girl friend. Fillyaw replied at this time that he lived at 204 East Vine with Jarrett's mother and sometimes stayed at 116–C East Vine Street. He gave a description of his girl friend and what she was wearing the evening of February 1, 1977. This description fit the body and the clothes found on the body found in the garage. At this time, Drakos informed Detectives Blackburn and Braun, present at the scene, of his conversation with Fillyaw.

Detectives Blackburn and Braun approached Fillyaw and asked where he lived and he replied for a second time at 204 East Vine. Fillyaw then repeated the same description of his girl friend matching that of the deceased found in the garage. The detectives then asked Fillyaw if he would go with them to the Police Administration building so they could interview him regarding his girl friend's recent activities and acquaintances. Fillyaw agreed to go but said that he first wanted to get a babysitter for his girl friend's baby he had left upstairs in the apartment. Detectives Blackburn and Braun went with Fillyaw to the apartment to wait for the babysitter. Fillyaw asked a neighbor to watch over the baby.

After the sitter arrived, Fillyaw went with the detectives to the Police Administration Building about 1:15 p.m. The police did not advise Fillyaw of his constitutional rights at this point as they testified that he was not a suspect or in custody at this time.

During the interview Fillyaw gave his address as 204 East Vine and stated that he also stayed with his girl friend at 116–C East Vine. As the interview continued, the detectives noticed what appeared to them to be blood spots on Fillyaw's coat and shoes. It was during this interview that Fillyaw showed the officers a note he had just written to Wanona Jarrett to make up with her after an argument. They also noticed that Fillyaw had a cut on his hand. When questioned about this, Fillyaw ex-

plained that he had cut his finger on glass earlier that day.

At about 2:45 p.m. on February 2, 1977, Detectives Blackburn and Braun received information that the victim in the garage had been stabbed. The officers received this information at approximately the same time they had noticed and questioned Fillyaw about the cut on his hand. Based upon the information that the victim had been stabbed and the fact that Fillyaw's hand was cut, the officers became suspicious of Fillyaw and, therefore, Detective Braun read him his constitutional rights. After being advised of his *Miranda* rights, Fillyaw repeated the information concerning Wanona's and his own activities which he had previously given the officers. At approximately 5 p.m., Fillyaw was placed under arrest for the murder of Wanona Jarrett. At that time, he was again advised of his *Miranda* rights. After being placed under arrest, Detective Braun took Fillyaw's gray leather coat, along with other items on his person, and placed them in police inventory.

Later in the evening of February 2, 1977, Fillyaw was taken to the Bureau of Identification where photographs were taken of his injured finger. He was then transported to Milwaukee County General Hospital to have the laceration to his finger treated. Before being conveyed to the hospital, Fillyaw was advised for a third time of his constitutional rights. While he was in the hospital, a nurse asked Fillyaw how he had injured his finger and, in the presence of Detective Sliwinski, Fillyaw responded that he had cut his finger with a knife. Detective Sliwinski had not asked the nurse to ask this question. After the defendant's cut was treated, Detective Sliwinski asked the defendant if he would "give us some blood samples" and Fillyaw agreed to do so. A separate hospital consent form was prepared by the hospital personnel at Detective Sliwinski's request, and signed by Fillyaw in

the detective's presence although the consent form did not specifically state that the consent was for taking a blood sample. Detective Sliwinski did not inform Fillyaw that he had a right to require the police to get a search warrant for the blood nor his right to refuse consent. Detective Sliwinski personally asked the defendant if he would give "us a blood sample" and he did not object. The doctor also informed the defendant that the police wanted a blood sample and he acquiesced. Further, Fillyaw was present when the nurse turned the blood sample over to the police detective and did not object at that time either.

Fillyaw was returned to the police station and was interrogated by Detectives James Mallette and Fred Reahorst in the early morning of February 3, 1977. Prior to interrogation, he was advised for a fourth time of his constitutional rights and he denies the completeness and sufficiency of the *Miranda* warnings given at this time. Fillyaw, in response to the officers' advice and questions replied that he did not need an attorney and he continued to answer the officers' questions.

At the time Fillyaw was being interviewed on the afternoon of February 2, 1977, the officers at the scene found the victim's purse containing her identification in the garage. Somewhere between 1:30 p.m. and 2 p.m. on February 2, 1977, the victim was identified as being Wanona Jarrett. After the victim's body was removed from the garage, it was taken to the Milwaukee County medical examiner's morgue where Dr. Elaine Samuels determined that Wanona Jarrett died after having been strangled and repeatedly stabbed. The investigation in the garage area continued during the afternoon of February 2, 1977. During the investigation, the officers found nothing inside or outside of the garage indicating a struggle. At approximately 4 p.m. that afternoon, Detective Douglas Paulos discovered red spotting of blood

in the snow from the base of the first step at the 116 East Vine Street address to the garage. This led the detectives to believe that the murder occurred someplace other than the garage and that the body was then carried into the garage.

After the blood spots leading to 116 East Vine St. were discovered at approximately 4 p.m. on February 2, 1977, the detectives on the scene extended their investigation to the apartment. Detective Andrew Andewenter, the officer in charge, went to Wanona Jarrett's apartment in the course of his investigation. He was let in by the babysitter with several other officers during the late afternoon of February 2, 1977. All of the officers testified that as a result of their investigation they found nothing in the apartment to indicate that Fillyaw or any other man resided there. It should be pointed out that none of the officers who entered Wanona's apartment on February 2, 1977, were present when Fillyaw, earlier that day, advised Officer Drakos that he was "staying at the apartment." Further, their investigation substantiated their belief that only Wanona Jarrett and her children lived there. While Detective Paulos was in the apartment, he seized two belts, one brown and one black.

About 4 p.m. on February 2, 1977, another detective, Alan Quosig, was dispatched to the 116–C East Vine Street address to look for anything else in the victim's apartment which would aid in the murder investigation. When Detective Quosig entered the apartment at about 5 p.m. he observed several officers and relatives of the victim already present. Quosig searched the apartment and seized a ragtop mop, a knife which appeared to have a meaty substance on the blade, and a bath towel which appeared to have blood on it.

It should be pointed out that the officers investigating the scene of the crime on the afternoon of February 2, 1977, had no knowledge of the fact that the detectives at

the police administration building had become suspicious of Fillyaw and had placed him under arrest at about 5 p.m. that day.

When the police left the victim's flat on February 2, 1977, no guard was posted to protect the premises or the area around the garage.

At approximately 2:30 p.m. the day following, Detective Jackelen received a phone call from the victim's mother, Rose Peters, who said she had been in the victim's apartment and had found what she suspected were blood spots. Detective Jackelen went to Mrs. Peters' home. She invited Detective Jackelen to accompany her to the victim's apartment. Mrs. Peters entered the apartment door and pointed out the spots that she suspected as being blood to Detective Jackelen. The detective then called a police photographer as well as crime lab personnel. With Mrs. Peters' permission, photographs were taken and various portions of the floor tile were removed for examination to determine if the spots were blood. Detective Jackelen did not have a search warrant. Although he testified that he was aware that Fillyaw had been arrested on February 2, 1977, for the murder of Wanona Jarrett, he testified that he had no knowledge that Fillyaw was in any way "connected" to Wanona Jarrett's apartment.

On March 10, 1977, Fillyaw was charged in a criminal complaint with the crime of first-degree murder and causing the death of Wanona Jarrett, and requested a preliminary hearing. After the hearing, the defendant was bound over for trial on the crime of first-degree murder and prior to trial, he filed, among other motions, motions to suppress: (1) the evidence seized from Wanona Jarrett's apartment on February 2, 1977; (2) the evidence seized from the same apartment on February 3, 1977; (3) all statements obtained from him by the police; (4) the clothing seized from his person on February 2,

1977; and (5) the blood sample taken from him. Extensive hearings regarding the suppression of these items were held. After the hearings, the court issued an order denying all the motions. After a request by defense counsel, the trial court agreed to make findings of fact and conclusions of law to explain its reasoning and authority for the denial of Fillyaw's motions, but failed to do the same.

After a jury trial, Fillyaw was found guilty of first-degree murder. Judgment was entered and Fillyaw was sentenced to life imprisonment. Fillyaw appealed the judgment of conviction to the court of appeals which reversed, holding that the search made of Wanona Jarrett's apartment on February 3, 1977, and the seizure of floor tiles containing blood samples from the apartment at that time were unconstitutional and, therefore, admission of evidence of tests made on these blood samples constituted prejudicial error. Central to this holding was the appellate court's determination that Fillyaw had standing to challenge the searches and seizures made of Wanona Jarrett's apartment. As the court found that the admission of evidence derived from the search and seizure of floor samples containing blood from the apartment premises on February 3, 1977, constituted prejudicial error, the court of appeals did not reach the remaining errors raised by Fillyaw.

*Issues*

1. Did the defendant have standing and a legitimate expectation of privacy in the murder victim's apartment such that he was entitled to challenge the search of the victim's apartment?

2. Did the defendant consent to the taking of the blood sample at the hospital on February 2, 1977?

3. Did the trial court err in refusing to suppress both the statements made by the defendant at the police sta-

tion prior to the time he was advised of his *Miranda* rights and the evidence seized during the custodial search of the defendant made at the time he was arrested?

4. Was the manner in which Detective James Mallette advised the defendant of his *Miranda* rights on February 3, 1977, inadequate and, if so, did the trial court err in refusing to suppress statements made by the defendant after being advised of his rights in that manner even though it was the fourth occasion he was advised of those rights for the crime of first-degree murder?

*Standing*

The United States Supreme Court, in *Rakas v. Illinois*, 439 U.S. 128 (1981), refocused its approach to the question of when a person is entitled to challenge the constitutionality of a search and seizure. Rather than view the question as one falling within the traditional concept of "standing," the court focused its analysis on whether "the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it." *Id.* at 140. This approach was based upon the recognition of the fact that the Fourth Amendment rights are personal rights which may not be asserted by another. *Id.* at 133. The inquiry as to whether these personal rights were violated "requires a determination of whether the disputed search and seizure has infringed on an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* at 140. In making this determination, the relevant question to be answered is whether the defendant had a legitimate expectation of privacy in the invaded place. As the United States Supreme Court noted in a recent decision applying *Rakas*:

"In *Rakas*, this Court held that an illegal search only violates the rights of those who have 'a legitimate expectation of privacy in the invaded place.' *Rakas, id.*, at 140, 99 S. Ct., at 430. See also *Mancusi v. DeForte, supra.*" *United States v. Salvucci*, 448 U.S., 83, 91 (1980).

Thus, in determining whether Fillyaw is entitled to challenge the constitutionality of the searches and seizures made at the victim's apartment, one must determine whether he had a legitimate expectation of privacy in Wanona Jarrett's apartment at the specific time that the searches were made. Since the trial court failed to make findings of fact when it denied Fillyaw's motions to suppress, it becomes necessary for us to review the record, *de novo*, as did the appellate court. In the absence of such findings, this court will independently review the record to make its own determination of this issue. *See: State v. Kraimer*, 99 Wis. 2d 306, 319, 298 N.W.2d 568 (1980). The question of whether a party has standing to challenge the constitutionality of a search and seizure based upon a given set of facts is a question of law and, therefore, on review this court need not defer to either the trial court's or the appellate court's determination of that issue.

Based upon its own *de novo* review of this case, the court of appeals concluded that Fillyaw had standing to challenge the searches of the murder victim's apartment as he stayed there rather regularly and slept with the victim; he babysat for the victim's children often;[4] and, at least one neighbor knew he stayed there with the victim.[5] The state argues, however, that this conclusion is erroneous as, among other factors, the appellate court overemphasized the subjective question of the defendant's expectations and ignored the more objective question of whether the defendant's expectations were legitimate.[6]

---

[4] In fact, Fillyaw was the father of one of the children.

[5] Unpublished decision of the Court of Appeals, Slip Op. at 8, (December 19, 1980).

[6] The court of appeals summarized elements discussed in *Rakas* which are relevant to the determination of whether one has a legitimate expectation of privacy as is seen below. We note this summary as it may be useful to courts in determining the stand-

At the suppression hearing, Rose Peters, Wanona Jarrett's mother, testified that Fillyaw continually resided at her home at 204 East Vine before and at the time of her daughter's murder, except when babysitting. In fact, for two to three months prior to Wanona's death, she received money from the Welfare Department for Fillyaw's rent. She also testified that Fillyaw received all his mail at her home at 204 East Vine, and never received mail at Wanona's apartment. Fillyaw kept his clothes at Peters' apartment and frequently slept there, although at times he did stay at Wanona's. Fillyaw never paid any of the bills at Wanona's apartment, including the rent, utilities or the phone bill. The furniture and appliances at Wanona's apartment were purchased by Wanona and after inspection Mrs. Peters testified she knew of no furniture or household item in the apartment belonging to Fillyaw. Peters did state that Fillyaw stayed at Wanona's apartment the night of the murder. In addition, during the months of December and January, Peters and Fillyaw shared the babysitting responsibilities for Wanona's children at Wanona's apartment while Wanona was vacationing out of the city.

Detective Paulos testified at the suppression hearing that when he searched Wanona Jarrett's apartment on February 2, 1977, he found nothing that indicated that Fillyaw lived there.

---

ing of defendants in other cases, although we point out that this list of elements is neither controlling nor exclusive.

"1. Whether one had a property interest in the premises;

"2. Whether one is legitimately (lawfully) on the premises;

"3. Whether one had complete dominion and control and the right to exclude others;

"4. Whether the person took precautions customarily taken by those seeking privacy;

"5. Whether the property was put to some private use;

"6. Whether the claim of privacy is consistent with historical notions of privacy."

Wanona Jarrett's sister testified that Fillyaw did not have a key to the apartment and that any time he wanted to gain entry to the apartment, he had to get the keys from Wanona and return them to her.

Fillyaw testified at the suppression hearing that he gave the address of 204 E. Vine because it was a condition of his probation that he live there, but he was actually living at 116–C East Vine with Wanona Jarrett and her children. He further stated he slept at the victim's apartment often while babysitting, but he did not pay any rent and owned none of the furniture therein. Fillyaw stated he had some clothes and a broken radio in a closet in the apartment. He admitted that he gave the Welfare Department his address as 204 E. Vine and that he also received his mail there.

A review of all of the testimony presented at the suppression hearings demonstrates that Fillyaw did not have a legitimate expectation of privacy in Wanona Jarrett's apartment at the time of the respective searches. Further, it should be noted that Fillyaw was not present at the time of either of the searches and if we are to believe all of the officers' testimony in contrast to that of Fillyaw's, the mere fact that Fillyaw had some clothes and a broken radio in the closet of the apartment is not of itself sufficient to give him a legitimate expectation of privacy in the apartment. As the United States Supreme Court noted in its recent decision in *Rawlings v. Kentucky*, 448 U.S. 98 (1980) :

"Petitioner contends nevertheless that, because he claimed ownership of the drugs in Cox's purse, he should be entitled to challenge the search regardless of his expectation of privacy. We disagree. While petitioner's ownership of the drugs is undoubtedly one fact to be considered in this case, *Rakas* emphatically rejected the notion that 'arcane' concepts of property law ought to control the ability to claim the protections of the Fourth Amendment. See 439 U.S., at 149–150, n. 17, 99 S. Ct.,

at 434, n. 17. See also *United States v. Salvucci,* 448 U.S., ante at 90–91, 100 S. Ct., at 2552–2553. . . . Prior to *Rakas,* petitioner might have been given 'standing' in such a case to challenge a 'search' that netted those drugs but probably would have lost his claim on the merits. After *Rakas,* the two inquiries merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner." *Id.* at 105–06.

The fact that Fillyaw was not a regular occupant of the premises and had no property interest in the apartment, did not pay rent, food bills, utility bills, owned none of the furniture, had no key to the apartment and only gained access to the apartment when Wanona Jarrett gave him a key and wanted him to be there, taken together, diminish any expectation of privacy which he infers from the fact that he had a few old possessions on the premises. Essentially, Fillyaw was nothing more than a paramour of Wanona Jarrett and a part-time babysitter for her children. His expectation of privacy is limited by that relationship. While he may have had a limited expectation of privacy while he was present in the apartment babysitting, the searches in question were conducted while he was absent from the apartment. Fillyaw had freely left the premises after voluntarily inviting the officers into and acquainting them with the apartment on February 2, 1977. Thus, Fillyaw no longer retained any control or dominion over the apartment which he might have asserted as a part-time babysitter.

Too, the extent that some of the evidence presented at the suppression hearings might support a subjective expectation of privacy on the part of Fillyaw, this expectation is not one which this court considers "legitimate" nor is it one that "society is prepared to recognize as reasonable." As noted by the United States Supreme Court in *Smith v. Maryland,* 442 U.S. 735 (1979) :

"Consistently with *Katz,* this Court uniformly has held that the application of the Fourth Amendment depends

on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action. [citations omitted]. This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' 389 U.S., at 361—whether, in the words of the *Katz* majority, the individual has shown that 'he seeks to preserve [something] as private.' *Id.*, at 351. The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable," ' *id.*, at 361—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances. *Id.*, at 353. See *Rakas v. Illinois*, 439 U.S., at 143–144, n. 12; *id.*, at 151 (concurring opinion); *United States v. White*, 401 U.S., at 752 (plurality opinion)." *Id.* at 740–41.

We do not find it reasonable that a babysitter and a houseguest would have an expectation of privacy of constitutional magnitude in the home of another. Nor do we find it reasonable for a paramour whose access to the premises is at the whim of his lover to claim an expectation of privacy in those premises.

The fact that Fillyaw paid no rent at the apartment and for all public purposes claimed residence at another location only adds to the refutation of his claim that his expectation of privacy is "legitimate." Fillyaw, based on the totality of the facts and circumstances concerning his alleged residency, must be held to the more accurate representations he made to a number of police officers, the welfare department, his probation officers and others, except during the crime investigation when it was to his advantage to assert that he lived elsewhere.

We hold, therefore, that Fillyaw did not have a reasonable expectation of privacy in Wanona Jarrett's apartment at the time it was searched nor an expectation of

privacy that "society is prepared to recognize as reasonable" and, therefore, he is not entitled to challenge the constitutionality of either of those searches.

Because of our holding, it is not necessary for us further to examine the constitutionality of either of the searches made of Wanona Jarrett's apartment.

In light of our determination that Fillyaw is without standing and thus not entitled to challenge the constitutionality of the searches and seizures in question, we next analyze the issues which the court of appeals did not reach in order to dispose of this case on appeal.

*Blood Sample*

Fillyaw claims that the trial court erred in failing to suppress the evidence relating to the defendant's blood type because there was no intelligent or voluntary consent to the taking of the blood sample at Milwaukee County Hospital.

Although the taking of blood constitutes a seizure within the meaning of the Fourth Amendment, *Schmerber v. California,* 384 U.S. 757, 769 (1966) ; *State v. Driver,* 59 Wis. 2d 35, 43, 207 N.W.2d 850 (1973), a warrant is not required for a search or seizure if the defendant freely and voluntarily consents to the search and seizure. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973). The question of whether a consent to a search was in fact "voluntary" is a question to be determined from the totality of all the circumstances. *Id.* at 227.

In this case, the blood sample was taken from Fillyaw shortly after he had been advised of his constitutional rights. It was taken after the treatment of his cut was finished and he was asked by the detective and the doctor if he would give a blood sample "for the police" and he acquiesced. Later, Fillyaw remained in the presence of the detective and the nurse when the nurse turned the blood sample over to the police. Fillyaw did not object to

the police officers' or the doctors' request for a blood sample for the police nor to the nurse's giving the blood sample to the officer. Although Fillyaw was not specifically told he could refuse to give the sample, this fact is of itself not determinative of the question. *Schneckloth, supra* at 227.

"The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. See *Miranda v. Arizona,* 384 U.S. 436, 508 (Harlan, J., dissenting) ; *id.,* at 534–535 (WHITE, J., dissenting). In none of them did the Court rule that the Due Process Clause required the prosecution to prove as part of its initial burden that the defendant knew he had a right to refuse to answer the questions that were put. While the state of the accused's mind, and the failure of the police to advise the accused of his rights, were certainly factors to be evaluated in assessing the 'voluntariness' of an accused's responses, they were not in and of themselves determinative. [citations omitted]." *Schneckloth v. Bustamonte, supra* at 226–27.

Fillyaw testified at the suppression hearing that he thought the sample was taken as part of the treatment of his finger. This testimony lacks credibility, however, when it is considered that Fillyaw initially did not recall signing the hospital form at all, the treatment of the finger was finished before the blood sample was taken, earlier in the same day he had been questioned as to blood spots found on his coat and shoes, Detective Sliwinski specifically asked Fillyaw if he would give the blood sample and the doctor told Fillyaw that the police wanted a blood sample and asked if he would comply with the request and he acquiesced.

In light of these facts and viewing the totality of the circumstances surrounding the blood sample, we hold that Fillyaw voluntarily consented to the taking of the blood

sample for police use. The conditions under which the sample was taken support the conclusion that Fillyaw knew that the sample was being taken for the purposes of the police investigation and thus his consent was properly requested before the sample was taken. The state has met its burden of proving the defendant voluntarily consented to the search by clear and convincing evidence. *Gautreaux v. State,* 52 Wis. 2d 489, 492–93, 190 N.W.2d 542 (1971).

As part of our analysis of this issue, we must reject as spurious Fillyaw's claim that his statement to the nurse regarding the manner in which he cut himself should be suppressed as being the fruit of an unconstitutional search. We note, however, that under any circumstance, the statement was unsolicited by the police and gratuitous. In no way can it be regarded as derived from the taking of the blood sample.

*Pre-Arrest Interview and Custodial Search*

Fillyaw argues that the trial court erred in refusing to suppress the statements concerning his and Wanona Jarrett's activities the night of her death which he made at the police station prior to 2:45 p.m. on February 2, 1977 when he was advised of his *Miranda* rights. He contends that the statements are the product of an illegal custodial arrest and were obtained in violation of his *Miranda* rights. Fillyaw also argues that it was error not to suppress the evidence seized during the custodial search made upon his arrest because this evidence was the fruit of his alleged illegal detention.

We reject Fillyaw's contention that he was subjected to an illegal custodial arrest because the record demonstrates that Fillyaw voluntarily accompanied the officers to the police station and that he did not have reason to believe he was in custody nor was he actually in custody

until the time that he was read and waived his *Miranda* rights prior to his arrest.

In holding that Fillyaw voluntarily accompanied police to the station and participated in the subsequent interview, we rely on the recent decision of the United States Supreme Court in *United States v. Mendenhall*, 446 U.S. 544 (1980). The defendant in that case was approached by law enforcement officers while walking through an airport concourse because the officers observed that her conduct was characteristic of persons unlawfully carrying narcotics. After the defendant was briefly interviewed by the officers, they asked if she would accompany them to their office in the airport. The defendant did so although the record did not indicate a verbal response to the request. After arriving in the office, the defendant consented to a search and heroin was discovered on her person. In arguing that the evidence of heroin should be suppressed at trial, the defendant contended that an unconstitutional seizure of her person occurred when the officers invited her to accompany them from the concourse to the law enforcement office.

The Supreme Court rejected this argument because the evidence demonstrated that the defendant had voluntarily consented to accompany the officers to the office. In determining that the defendant's consent was indeed voluntary, the Court applied the following test:

"The question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances, *Schneckloth v. Bustamonte*, 412 U.S., at 227, and is a matter which the Government has the burden of proving." *United States v. Mendenhall, supra* at 557.

The court applied this standard to the evidence in the following manner and concluded that the defendant's consent was voluntary:

"The Government's evidence showed that the respondent was not told that she had to go to the office, but was simply asked if she would accompany the officers. There were neither threats nor any show of force. The respondent had been questioned only briefly, and her ticket and identification were returned to her before she was asked to accompany the officers.

"On the other hand, it is argued that the incident would reasonably have appeared coercive to the respondent, who was 22 years old and had not been graduated from high school. It is additionally suggested that the respondent, a female and a Negro, may have felt unusually threatened by the officers, who were white males. While these factors were not irrelevant, see *Schneckloth v. Bustamonte, supra,* at 226, neither were they decisive, and the totality of the evidence in this case was plainly adequate to support the District Court's finding that the respondent voluntarily consented to accompany the officers to the DEA office." *Id.* at 557–58.

Applying the standard set out by the United States Supreme Court, we hold that the totality of the circumstances support the conclusion that in this case, Fillyaw voluntarily consented to accompany the officers to the police station and participate in the interview.

In this case, it is undisputed that it was Fillyaw who initially approached the officers. This differs from the situation in *United States v. Mendenhall* in which the defendant was approached by the officers. This fact indicates that the encounter between Fillyaw and the officers was not in the least coercive, unlike the situation presented in *Mendenhall.* In addition, in this case it is clear that Fillyaw expressly agreed to accompany the officers whereas in *Mendenhall* the defendant did not express her consent. Before the defendant was taken to the police station, he invited the officers into the apartment and waited with them while he obtained a babysitter and then voluntarily accompanied them to the police administration building. Fillyaw was not in custody, handcuffed or restrained in any way, manner or

form when he accompanied the officers to the police station, which was a more convenient place to hold an interview.

Besides these facts, the record demonstrates that the objectives of the police at this time were to gather information concerning any information he may have had about the deceased's last hours, friends and acquaintances. It is clear from prior decisions of this court that general questioning of citizens in the fact finding process is not a violation of *Miranda* rights. *State v. Kraimer, supra* at 330; *Britton v. State,* 44 Wis. 2d 109, 170 N.W.2d 785 (1969):

" 'Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo v. Illinois.* . . . When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. *General on-the-scene questioning as to facts surrounding a crime* or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.' [emphasis in original]. *Miranda, supra,* pp. 477, 478." *State v. Kraimer, supra* at 329-30.

There is absolutely no evidence that Fillyaw wished to leave and was prevented from doing so. Even when informed of his constitutional rights, Fillyaw waived them. In light of the facts discussed and the decision in *United States v. Mendenhall,* we conclude that Fillyaw voluntarily consented to the interview at the police station. For this reason, he was not subjected to an illegal custodial arrest.

Our holding that Fillyaw voluntarily consented to the initial interview at the police station compels the conclu-

sion that his *Miranda* rights were not violated during the interview as they were not necessary in that he was not at that time in custody.

*Miranda* warnings were required, however, at the time that Fillyaw was subjected to "custodial interrogation." *Miranda, supra* at 478–79. Fillyaw was subjected to "custodial investigation at the time that the police began to consider him a suspect and, therefore, would no longer permit him to leave if he desired to. Detective Braun testified that he would have allowed Fillyaw to leave the station up until the time he described the manner in which he cut his finger and he learned from other sources that the victim had been stabbed. Braun testified that the statement regarding the manner in which Fillyaw cut his finger was made just before he advised Fillyaw of his rights. We hold that this conclusion is supported by the record and, therefore, the requirements of *Miranda* were satisfied.

Our review of the evidence demonstrates that Fillyaw consented to the initial interview at the police station and was properly advised of his *Miranda* rights at the time that he became a suspect and became the subject of "custodial interrogation." Therefore, we hold that the trial court did not err in refusing to suppress the statements made by Fillyaw during this initial interview.

Fillyaw argues that the evidence gathered subsequent to his initial interview at the police station should be suppressed because it is the fruit of an illegal detention. Because we hold that Fillyaw's constitutional rights were not violated during the initial interview, we reject Fillyaw's "fruit of the poisonous tree" arguments as meritless.

Regarding Fillyaw's claim that his coat and other items were illegally seized after his arrest, we note that the seizure of these items was clearly constitutional as a

custodial search after arrest. As we stated in *Warrix v. State,* 50 Wis. 2d 368, 184 N.W.2d 189 (1971):

"But, this court in *State v. Stevens* (1965), 26 Wis. 2d 451, 460, 132 N.W.2d 502, has upheld a custodial search of the person on the ground it was required for the safety of the prisoner and the law enforcement officers and by the efficient operation and administration of a jail. Such custodial search after arrest must bear a reasonable relationship, not to the arrest, but to jail custodial purposes and one of the custodial requirements is the inventorying of possessions belonging to the accused and placing them in safekeeping during his custody in jail. If contraband or evidence or fruits of a crime are found in this process, the discovery does not make the search unreasonable." *Id.* at 376.

Thus, the police were entitled to inventory his coat and shoes which had blood on them.

*Adequacy of February 3, 1977 Miranda Warnings*

Fillyaw contends that the trial court erred in refusing to suppress the statement he gave on February 3, 1977 to Detectives Mallette and Reahorst because the recital of *Miranda* warnings given prior to the interrogation was inadequate in that they did not properly alert Fillyaw to his right to counsel prior to trial and his right to stop answering questions at anytime. In considering this argument, we note that this was the fourth occasion on which Fillyaw was informed of his *Miranda* rights. Fillyaw did not challenge the adequacy of any of the *Miranda* warnings given on those earlier occasions.

In considering this contention, we note that the exact wording of the warnings given by Officer James Mallette in the early morning hours of February 3, 1977 was controverted by the state at trial. Officer Mallette testified that he recited the *Miranda* warnings to the defendant in the following manner:

"*Q*. What rights did you specifically advise Mr. Fillyaw of? *A*. I first advised him of the charges. He was charged with murder and possession of a controlled substance.

"*Q*. Did he make any response to that? *A*. He said he knew that. Then I advised him I was going to ask him several questions and that he had the right to remain completely silent and that all of these questions I asked him he had the right to answer all of them, some of them, or none of them. And my questions—any questions he answered and the answers could be used in court.

"He [sic "I"] advised him he had a right to have an attorney present while I was talking to him. I also told him he could call an attorney before I talked to him and stated when he did go to court if charges were issued against him, the State of Wisconsin would have to provide an attorney for him if he couldn't afford one."

Officer Reahorst, however, testified that Officer Mallette used the following language in reciting the *Miranda* rights to Fillyaw.

"*A*. He advised him of his Constitutional Rights stating to Mr. Fillyaw, 'You have a right to remain silent. Anything that you say will be held against you in a court of law. You have a right to have an attorney present during any questioning. If you cannot afford an attorney, one will be appointed to you.'

"He also stated, 'You do not have to answer any questions. You may answer, and you can answer all of them or you can just pick some of them.' And then we asked him if he understood these rights, and he stated that he did."

The conclusion that the warnings given were adequate is supported by the record.

Even assuming that the warnings were given as testified to by Officer Mallette, we hold that they are sufficient to apprise Fillyaw of his constitutional rights. Our decision in *Grennier v. State*, 70 Wis. 2d 204, 234 N.W.2d 316 (1975) clearly governs this case and compels the conclusion that the warnings were sufficient:

"The Oak Creek version of the *Miranda* warning was substantially correct but contained the statement:

" 'We have no way of giving you a lawyer if you cannot afford one, but one may be appointed for you, if you wish, if and when you go to court.'

"It is argued by the defendant that the effect of this statement was to inform the defendant that no counsel could be appointed for him during the custodial interrogation. If the admonition is so interpreted, it is incorrect, since we have repeatedly stated that it is the duty of the state to provide an attorney for custodial interrogation and that, unless the state does so, the interrogation may not proceed unless the defendant expressly waives his right to have counsel present. The admonition went on, however, to say that the defendant had the right to remain silent and if he had no lawyer present that he had 'the right to stop answering questions at any time.'

". . .

". . . we find the *Miranda* warning administered at the Oak Creek police station constitutionally sufficient. We, nevertheless, do not commend its continued use." *Id.* at 213, 214, 215.

Reference to this decision is sufficient to support our rejection of Fillyaw's arguments.

We do note, however, that as in *Grennier,* the challenged instructions were given after the defendant had received constitutionally sufficient warnings on several occasions. These prior recitals of the *Miranda* rights are clearly significant in determining whether a defendant has been adequately informed of his constitutional rights. It is not necessary to repeatedly recite the *Miranda* warnings during an investigation of the same person for the same crime in order to satisfy the constitutional requirement that the defendant be apprised of his rights.

Our holding that Fillyaw was adequately advised of his *Miranda* rights is also supported by the recent decision of the United States Supreme Court in *California v. Prysock,* ― U.S. ―, 101 S. Ct. 2806 (1981). In that decision the Court used the following language in ex-

pressly holding that *Miranda* warnings can be constitutionally adequate although the form of the warnings given varies somewhat from that set out in the *Miranda* decision:

"This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant. . . .
"Quite the contrary, *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that '[t]he warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent*, prerequisites to the admission of any statement made by a defendant.' 384 U.S. at 476, 86 S. Ct., at 1629 (emphasis in original). See also id., at 479, 86 S. Ct., at 1630. Just last Term in considering when *Miranda* applied we noted that that decision announced procedural safeguards including 'the now-familiar *Miranda* warnings . . . or their equivalent.' *Rhode Island v. Innis,* 446 U.S. 291, 297, 100 S. Ct. 1682, 1688, 64 L. Ed. 2d 297 (1980) (emphasis in original)." *Id.* at 2809.

We hold, therefore, that the trial court did not err in refusing to suppress the statements made by Fillyaw to Detectives Mallette and Reahorst on February 3, 1977.

The consideration of the merits of this appeal has been significantly hampered by the absence of findings supporting the trial court's denial of the motions to suppress. In the interest of facilitating appeals and rendering justice to all parties to an action, we again direct that the trial courts of this state make findings of fact and conclusions of law in support of their decisions on motions to suppress.

Our review of the record in this case compels the conclusion that Fillyaw was not entitled to challenge the searches made of Wanona Jarrett's apartment because he did not have either a legitimate expectation of privacy in the premises at the time searched or an expectation of

privacy which society is prepared to recognize as reasonable. Therefore, the decision of the court of appeals reversing the trial court due to prejudicial error is reversed and the trial court's judgment is reinstated.

*By the Court.*—The decision of the court of appeals is reversed and the judgment of the trial court affirmed.

SHIRLEY S. ABRAHAMSON, J. *(concurring)*. I write separately to express concerns I have with the majority's deciding the fourth amendment issue of the defendant's "reasonable expectation of freedom from governmental intrusion" without remanding the cause to the circuit court for findings of fact and conclusions of law.

In denying the defendant's motion to suppress, the circuit court failed to make either findings of fact or conclusions of law. Thus for the majority to render a decision on this record it must either conclude that the material facts are not in dispute, and as such the lack of findings is irrelevant, or that even though the facts are in dispute this court can itself find the facts and draw the necessary inferences therefrom. It is unclear from the majority opinion whether the majority considers that the facts or inferences to be drawn therefrom are in dispute or whether the majority considers the facts undisputed.

This court has held that where there were no findings, or where the findings were inadequate, and an issue upon which there is no finding appears from the record to exist, the appellate court may assume that the circuit court determined the issue in favor of or in support of its decision. *Sohns v. Jensen,* 11 Wis. 2d 449, 453, 105 N.W.2d 818 (1960). *Sohns* is not helpful in this case because the circuit court failed to set forth the rationale for its decision to deny the motion to suppress.

The circuit court might have decided that the defendant had "standing," but that the search was reasonable.

This court would then resolve factual disputes in favor of the defendant on the standing issue and against the defendant on the reasonableness issue. Or the circuit court might have concluded that the defendant had no standing and might never have reached the reasonableness issue. In this event this court would resolve factual disputes against the defendant on the standing issue.

If there is a factual dispute in this case, the *Sohns* rule that the appellate court can assume that the facts were decided by the circuit court in support of that court's decision is not applicable because we do not know the decision of the circuit court. We do not know whether the circuit court denied the motion to suppress because it concluded that the challenged search and seizure did not infringe on any rights or interests of the defendant which were protected by the fourth amendment or because it concluded that the challenged search and seizure did not violate the fourth amendment.

If there is a factual dispute in this case, the *Wurtz* rule comes into play. In *Wurtz v. Fleischman,* 97 Wis. 2d 100, 108, 293 N.W.2d 155 (1980), this court said that when the facts are in dispute and the circuit court has made no findings or has made inadequate findings "the only appropriate course" for an appellate court "is to remand the cause to the trial court for the necessary findings."

This case illustrates again that unless the circuit court states its findings of fact and conclusions of law, meaningful appellate review is hampered. I therefore urge circuit courts to set forth their findings of fact and conclusions of law in deciding motions to suppress.

Since the majority does not remand the cause to the circuit court for findings, I conclude that the majority must mean that what took place, *i.e.,* the historical facts, the physical facts and the factual inferences therefrom, are undisputed. Thus the majority's *de novo* review of

the record must have been to determine the undisputed facts.

If I assume for the moment that the facts are undisputed, the question facing this court is one of law, *i.e.,* what is the legal significance of the facts. To state the question another way, do the facts fulfill the constitutional standard. *Nottleson v. DILHR,* 94 Wis. 2d 106, 115–116, 287 N.W.2d 763 (1980).

The court in this case must determine whether the totality of the facts is such that it gives rise to a legitimate or reasonable expectation on the part of the defendant to privacy, *i.e.* to be free from governmental intrusion. *Rakas v. Illinois,* 439 U.S. 128 (1981). The majority opinion of the United States Supreme Court in *Rakas* neither defined legitimate expectation of privacy nor specifically listed the factors which are determinative of the reasonableness of the defendant's asserted privacy expectations. The majority in *Rakas* did, however, say that a legitimate expectation of privacy means "more than a subjective expectation of not being discovered." The majority in *Rakas* further explained that the "legitimacy of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." In regard to concepts of property law, the *Rakas* majority said that "expectations of privacy protected by the Fourth Amendment . . . need not be based on common-law interest in real or personal property," but that "the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment." 439 U.S. at 144, n. 12. In regard to "the understandings that are recognized and permitted by society," the *Rakas* majority did not tell us how we determine these understandings.

Admittedly, the determinations of what are the everyday expectations of privacy which we all share and what facts fit these expectations are not easy to make. The majority, concurring, and dissenting opinions of the United States Supreme Court in *Rakas* acknowledge that the *Rakas* test "will not provide law enforcement officials with a bright line between the protected and the unprotected." *Rakas v. Illinois,* 439 U.S. at 168; *see also* 439 U.S. at 144–148, 152. Because the majority bases its decision on *Rakas*[1] and its case-by-case approach, it is incumbent upon this court to explicate carefully the factors in each case which are determinative of the issue of "legitimate expectation of privacy" so that law enforcement officials, the circuit courts, and the court of appeals can better deal with the multitude of situations they may encounter.

Fortunately the majority lists six elements it regards as helpful and relevant to the determination of what are legitimate expectations of privacy.[2] This list was origi-

---

[1] While *Rakas* and the Fourth Amendment upon which it is based determine the minimal constitutional protection that state courts must afford defendants, this court could, under the Wisconsin Constitution, Art. I, sec. 11, formulate its own standards for determining when a defendant has standing to challenge a search. *See State v. Alston,* 30 Cr. L. 2129 (N.J. 10/21/81), where the New Jersey Supreme Court refused to follow *Rakas* and its progeny, *United States v. Salvucci,* 448 U.S. 83 (1980), which abandoned the automatic standing rule for possessory offenses under the Fourth Amendment. The New Jersey court relied on the protections against unreasonable search and seizures guaranteed by its state constitution, refusing to adopt the United States Supreme Court's interpretation of standing under the Fourth Amendment as its interpretation of standing under its state constitution.

[2] The majority at pp. 711, 712, note 6, explains the six elements as follows:

"The court of appeals summarized elements discussed in *Rakas* which are relevant to the determination of whether one has a legitimate expectation of privacy as is seen below. We note this

nally compiled by the court of appeals from its reading of the majority and concurring opinions in *Rakas*. Unfortunately, neither the opinion of the court of appeals nor that of the majority explicitly analyzes the facts of this case in terms of these six elements. I read both opinions, however, as implicitly concluding that the defendant satisfied elements 2, 4, 5 and 6 and failed to satisfy the first element. Thus the different result reached by the court of appeals and the majority apparently turns on the meaning of the third element and whether the facts satisfy the third element—whether the defendant "had complete dominion and control and the right to exclude others."[3]

Initially it should be noted that the majority and the court of appeals do not appear to be interpreting the third element differently. They both appear to conclude that this third element cannot be read to mean that there can be no legitimate expectation of privacy unless the person asserting the expectation is the only person who has complete dominion and control over the premises. *Jones v. United States*, 362 U.S. 257 (1960) makes that

---

summary as it may be useful to courts in determining the standing of defendants in other cases, although we point out that this list of elements is neither controlling nor exclusive.

"1. Whether one had a property interest in the premises;

"2. Whether one is legitimately (lawfully) on the premises;

"3. Whether one had complete dominion and control and the right to exclude others;

"4. Whether the person took precautions customarily taken by those seeking privacy;

"5. Whether the property was put to some private use;

"6. Whether the claim of privacy is consistent with historical notions of privacy."

[3] This element was derived by the court of appeals from *Jones v. United States*, 362 U.S. 257 (1960). For a discussion of *Rawlings v. Kentucky*, 448 U.S. 98 (1980), and the right to exclude others, *see* LaFave, *Search and Seizure*, sec. 11.3, pp. 111–15 (1981 Supp.).

clear. In *Jones* the defendant was held to have a legitimate expectation of privacy in a friend's apartment for which he had a key. Jones' dominion and control was shared with the tenant, his friend. When the search was conducted Jones was present on the premises. Based on these facts the United States Supreme Court concluded that Jones had complete dominion and control. Since *Jones* the Court has not specifically commented on what it means by "complete control and dominion."

A comparison of the majority opinion with that of the court of appeals reveals that the authors of the opinions have drawn different factual inferences from the testimony and have applied the third element to different "findings" of fact.

The court of appeals has inferred from the record that the defendant stayed at the victim's apartment regularly; that although it is not clear that the victim's apartment was the defendant's regular home, the defendant used the apartment with some frequency; and that the defendant could exercise control over the apartment and could exclude others from the apartment. On these findings of fact the court of appeals concluded that the defendant had complete dominion and control and on the basis of all the facts and circumstances the court of appeals concluded that the defendant had standing.

The majority on the other hand infers that the defendant "was not a regular occupant of the premises" and "only gained access to the apartment when Wanona Jarrett gave him a key and wanted him to be there." *Supra,* p. 714. Implicit in the majority's inference is the finding that the apartment was kept locked; that the defendant's access to the apartment was restricted by the victim's possession of the only key; that the defendant spent time in the apartment only when allowed to do so by the victim and only on terms set by the victim; and that the defendant's access to and control over the apart-

ment was limited to when he was present with the victim's consent as a babysitter or lover. On these findings of fact the majority concludes that the defendant did not have complete dominion and control and on the basis of all the facts and circumstances the majority concludes that the defendant did not have standing.

I have read the record, and I conclude that neither the inferences drawn by the court of appeals nor those drawn by the majority are against the great weight and clear preponderance of the evidence. Having reached this conclusion I must further conclude that neither this court nor the court of appeals is the appropriate tribunal to draw these inferences so essential to a decision in this case. These factual inferences must be made by the circuit court which heard the testimony, saw the witnesses and evaluated their credibility. I would therefore remand the matter to the trial court to make findings of fact and conclusions of law.

I also wish to express my concerns about several other matters arising in this case.

First, the majority opinion should not be read to mean that because the victim's apartment was not defendant's regular, usual or primary home, the defendant could have no reasonable expectation of privacy in the apartment. A person can have more than one dwelling and a reasonable expectation of privacy in each dwelling. Also a person can have a reasonable expectation of privacy in a place other than his own dwelling. A person's privacy can be protected in a hotel room, *Hoffa v. United States,* 385 U.S. 293 (1966) ; a union hall, *Mancusi v. DeForte,* 392 U.S. 369 (1964) ; a phone booth, *Katz v. United States,* 389 U.S. 347 (1967) ; a business office, *Silverthorne Lumber Co. v. United States,* 251 U.S. 385 (1920) ; a friend's apartment, *Jones v. United States,* 362 U.S. 257 (1960) ; a footlocker, *United States v. Chadwick,* 433 U.S. 1 (1977) ; and even a taxicab, *Rios v. United States,*

364 U.S. 253 (1960). Thus, though it is apparent the defendant did maintain at least the semblance of a home with the victim's mother, this does not preclude his having a privacy interest in another place of residence. The majority's recitation of the evidence showing defendant's relation to the mother's house is significant only to the extent that it is probative of the nature of the defendant's use of the victim's apartment and the nature of his expectation of privacy in the victim's home.

Second, the majority opinion should not be read to mean that the defendant had no reasonable expectation of privacy because he and the victim used the apartment not only for private purposes as a residence but for illicit private purposes. It is clear from the record that the defendant used the victim's apartment for private purposes. He slept in the apartment with the victim and he often took care of her children, which included a child of his own. Although the majority concluded that the defendant did not have a legitimate expectation of privacy in the apartment at the time it was searched, the majority does acknowledge that the defendant's activities did give rise to a limited expectation of privacy at certain times. *Supra*, p. 714.

I express a final concern over the majority's failure to explain adequately why if the defendant had a legitimate expectation of privacy in the apartment at certain times, the expectation of privacy did not exist at the time of the searches in question. The majority acknowledges that the defendant had "a limited expectation of privacy while he was present babysitting." *Supra*, p. 714. The defendant had been babysitting the morning of the murder and later into the day when he left the apartment to be interviewed by the police. The majority apparently concludes without discussion or elaboration that either the defendant's expectation of privacy as babysitter ended when he found someone else to watch the children while he went

with the police or that his expectation of privacy was not violated by a general search of the apartment in contrast to a search of his personal effects. These are two different holdings, and it is unclear which one the majority adopts. The lack of clarity in the majority's opinion may be attributable to the lack of findings of fact by the circuit court.

For the reasons set forth, I concur that the court of appeals decision should be reversed.