STATE of Wisconsin, Plaintiff-Respondent,

v.

Burdette WOODS, Defendant-Appellant-Petitioner.

Supreme Court

*No. 81–2297–CR. Argued October 5, 1983.—
Decided March 27, 1984.*

(Also reported in 345 N.W.2d 457.)

704

For the petitioner there were briefs by *William J. Tyroler,* assistant state public defender, and *William G. Retert,* first assistant state public defender, and oral argument by *Mr. Tyroler.*

For the plaintiff-respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

WILLIAM A. BABLITCH, J. Burdette Woods seeks review of an unpublished decision of the court of appeals affirming his conviction of second degree murder and manslaughter. He argues that his oral confession should have been suppressed because it was obtained in violation of his constitutional and statutory rights. We hold that his oral confession was admissible, and we therefore affirm his conviction.

The issues presented for review are:

(1) Did the police have probable cause to take Woods into custody on a charge regarding the theft of a chain saw? We conclude that they did.

(2) Was the taking of Woods into custody on a charge regarding the theft of a chain saw rendered illegal because it was the stated purpose of the police to question

Woods about another crime once they had him in custody? We conclude that it was not.

(3) Did Woods waive his right to counsel? We conclude that he did.

(4) Did Woods' conduct before and during questioning constitute an assertion of his right to remain silent, thereby rendering the continued questioning of Woods by the police a violation of his constitutional rights? We conclude that Woods' conduct was not an assertion of his right to remain silent.

(5) Did Woods waive his right to remain silent? We conclude that he did.

(6) Under the totality of circumstances, were Woods' waivers of his right to counsel and his right to remain silent knowingly, intelligently and voluntarily made? We conclude that they were.

(7) At the time Woods was taken into custody and questioned, did he have a right to counsel under sec. 48.23(1)(a), Stats., and under the sixth and fourteenth amendments to the United States Constitution? We conclude that he did not. We affirm the decision of the court of appeals.

Henry and Beryl Schwab were beaten to death in their Shawano county home on September 10, 1979. The day after their bodies were found, it was reported to the police that Burdette Woods, a juvenile who was sixteen years, nine months old, had been seen in the vicinity of the Schwab home either on the day of the murders or the following day. Woods was subsequently observed closely watching officers investigate the scene of the murders. Woods became the focus of the murder investigation on September 19, 1979.

During the course of the investigation, but prior to the time that Woods became the focus of it, the police received information from a reliable source that Woods had made an unsolicited attempt to sell a chain saw to

a nearby resident. Officers investigated and discovered that the saw had been stolen seventeen months earlier from a local hardware store. On September 22, the officers obtained a written statement from the individual to whom Woods had attempted to sell the saw.

On September 23, 1979, officers Trombi and Thorpe went to Woods' grandparents' trailer, where Woods was living, and took him into custody on a charge regarding the theft of the saw. The officers, with the knowledge of David Gage, a juvenile intake worker, had made a decision prior to that time to question Woods about the Schwab murders immediately after they had Woods in custody. The officers took Woods to their squad car, and Trombi read *Miranda* warnings to him. Trombi asked Woods if he understood his rights, to which Woods responded by making affirmative head gestures that he did. Trombi asked Woods if he wished to consult an attorney, to which Woods shook his head "no." Trombi then asked Woods if he wished to answer questions or make a statement, to which Woods did not respond.

Within one-half hour after the officers had taken him into custody, Woods was taken to the sheriff's department, where Gage met them. At the suppression hearing, Trombi testified that Gage again informed Woods of his rights. Woods indicated that he had already been read his rights. Gage also asked Woods if he wanted an attorney, to which Woods replied "no."[1] At the suppression

[1] At the suppression hearing, Gage testified as follows:

"And then I asked him [Woods] if he knew what this was about. And he said yes. And I said 'Did they read you your rights?' And he said 'yes'. And I said 'Did they tell you your rights?' And he said 'Yes'. And I said 'Did they read you the bottom of that sheet out to you of the rights that you have?' And he said 'Yeah'. And I said 'Did you sign it?' And he said 'Yeah.' And I said 'Do you want an attorney?' And he said 'No.' . . . ."

Gage also testified that he told Woods that Woods had a right to a lawyer.

hearing, Gage testified that he additionally had asked Woods if Woods needed anything, and he thought Woods said that he wanted some cigarettes. Gage then filled out a form entitled "Request for Temporary Physical Custody."

After a 45-minute booking procedure, Trombi and Thorpe took Woods to a well lit and ventilated room where they questioned him for approximately 15 to 20 minutes. Woods was seated at a table and Thorpe and Trombi were seated near him. Woods was not handcuffed or otherwise restrained. The officers had placed a photograph album on a table in the room. The album contained some 3½" x 5" pictures of the murder scene and the surrounding area. The album was open to pictures of the Schwabs taken after they had been murdered, and was placed approximately one to two feet from where Woods was seated.

During the questioning, Trombi and Thorpe asked Woods several times if Woods wanted to talk to them. Woods did not respond to those questions. Trombi and Thorpe also asked Woods questions concerning the Schwab murders. At one point, Trombi asked Woods why he went into the woods the day after the murders and Woods replied, "I never went in the woods the next day." Woods made no other verbal responses while Thorpe and Trombi questioned him.

After their questioning, Trombi and Thorpe left the room. Robert Ankenbrandt and Wendell Harker, investigators from the Wisconsin Division of Criminal Investigation, then entered the room. Trombi had informed them that he had advised Woods of his constitutional rights. Once inside, Harker asked Woods if he had been advised of his rights by Trombi, to which Woods responded affirmatively. Ankenbrandt and Harker then began questioning Woods about the Schwab murders. Woods made no response to their questions until approximately twenty to thirty minutes into the questioning. At

that point, Woods gave an oral statement, in which he acknowledged that he had killed the Schwabs and gave detailed facts about the murders.

After Woods gave the oral statement, Harker again advised him of his *Miranda* rights. Woods stated that he did not have any money to hire an attorney. Harker and Ankenbrandt then obtained a written statement from Woods, in which Woods confessed to killing the Schwabs.

Juvenile court jurisdiction over Woods was waived, and a criminal complaint was filed against him. Woods subsequently filed a motion to suppress the oral and written statements in which he confessed to the murders. The trial court, citing Woods' statement that he did not have any money to hire an attorney, granted the motion to suppress the written statement on the grounds that it was obtained in violation of Woods' right to counsel. However, the court denied the motion to suppress the oral statement, which had been given prior to Woods' statement about his inability to pay for an attorney.

Woods pled guilty, was convicted and sentenced. He subsequently appealed to the court of appeals, which affirmed the judgment. Woods then filed a petition for review, which we granted.

## TAKING INTO CUSTODY

*1. Did The Officers Have Probable Cause To Take Woods Into Custody On A Charge Regarding The Theft Of A Chain Saw?*

Woods argues that the officers did not have probable cause to take him into custody. Woods cites our decision in *Gautreaux v. State,* 52 Wis. 2d 489, 495–96, 190 N.W. 2d 542 (1971), in which we recognized that while mere possession of stolen property raises no inference of guilt, the unexplained possession of recently stolen property raises an inference of greater or less weight depending

upon the circumstances. Woods contends that because the chain saw he attempted to sell was stolen seventeen months earlier, it could not be considered recently stolen property, which could create an inference of culpability.

If the historical facts are undisputed, probable cause for an arrest is a question of law that is subject to independent review on appeal, without deference to the trial court's conclusion. *State v. Drogsvold,* 104 Wis. 2d 247, 262, 311 N.W.2d 243 (Ct. App. 1981). Because the facts in this case are undisputed, we may independently review whether the officers had probable cause to take Woods into custody.

Section 48.19(1)(d)3, Stats., provides that a child may be taken into custody under circumstances in which the officer believes on reasonable grounds that the child committed an act in violation of a state or federal criminal law. Section 48.19(3) provides: "Taking into custody is not an arrest except for the purpose of determining whether the taking into custody or the obtaining of any evidence is lawful." Because Woods challenges the the lawfulness of the officers' action in taking him into custody, the standards governing probable cause to arrest an adult are applicable to a determination whether the taking of Woods into custody was lawful.

Reasonable grounds and probable cause are synonymous, and are defined as follows: " 'The "reasonable grounds" or what is more commonly referred to as probable cause, is that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime.' " *Johnson v. State,* 75 Wis. 2d 344, 348, 249 N.W.2d 593 (1977), quoting *Ball v. State,* 57 Wis. 2d 653, 659, 205 N.W.2d 353 (1973). The question is whether the "facts and circumstances . . . were such that police officers of reasonable caution could

have believed the defendant probably committed the crime." *Johnson,* 75 Wis. 2d at 350.

A violation of sec. 943.20 (1) (a), Stats., occurs when a person "intentionally takes and carries away, uses, transfers, conceals, or retains possession of movable property of another without his consent and with intent to deprive the owner permanently of possession of such property." A violation of sec. 943.34 occurs when a person intentionally receives or conceals stolen property. *See* Wis. J.I.— Criminal, sec. 1481. In this case, officers learned prior to taking Woods into custody that he had made an unsolicited attempt to sell a chain saw valued at $134.95 for $20.00 to Sheldon Davids. Woods was apparently not well known to Davids because Davids did not even know Woods' correct surname. Woods indicated to Davids that his grandfather had given him the saw. Davids took the saw and told Woods that he should stop back later so that Davids would pay him. When Davids' father learned of the attempted sale, he became suspicious and immediately checked with the sheriff's department, informing the department that Woods had offered to sell a chain saw to his son. Mr. Davids subsequently gave the saw to officers at the sheriff's department. The officers checked the serial number on the saw and determined that it matched the serial number of a chain saw that the owner of a hardware store had reported was stolen on March 16, 1978. Based on these undisputed facts, we conclude that police officers of "reasonable caution" could have believed that Woods committed the crime of theft, contrary to sec. 943.20 (1) (a), or the crime of receiving stolen property, contrary to sec. 943.34. The officers therefore had probable cause to take Woods into custody.

*2. Was The Taking Of Woods Into Custody On A Charge Regarding The Theft Of A Chain Saw Rendered*

*Illegal Because It Was The Stated Purpose Of The Police
To Question Woods About The Murders Immediately
Thereafter?*

Woods contends that the officers violated his right under the fourth amendment to the United States Constitution and Article I, sec. 11 of the Wisconsin Constitution to be protected from unreasonable searches and seizures. He argues that his custody and detention were unreasonable seizures because the officers' motivation in taking him into custody was to interrogate him about the Schwab murders.

In support of this argument, Woods cites the discussion in W. LaFave, *Search And Seizure,* sec. 1.2 at 26 (1983 Pocket Part), concerning fourth amendment activity that would not have been undertaken ". . . but for the 'underlying intent or motivation' which, standing alone, could not supply a lawful basis for the police conduct." These situations may result in the suppression of evidence acquired pursuant to the fourth amendment activity undertaken. *See, e.g., State v. Volk,* 291 So. 2d 643 (Fla. App. 1974).

The determination whether the taking of Woods into custody was illegal because it violated his fourth amendment rights is a question of law. We independently review questions of law. *See First Nat. Leasing Corp. v. Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977). We conclude that the officers' decision to take him into custody was lawful because it was supported by probable cause. The United States Supreme Court has held that:

". . . the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Scott v. United States,* 436 U.S. 128, 138 (1978).

Although the officers wanted to question Woods concerning the Schwab murders, that does not render his custody invalid or unreasonable. At the time Trombi and Thorpe took Woods into custody, there were reasonable grounds to believe that Woods had violated a state criminal law. This provided a lawful basis for the officers to take Woods into custody.

In addition, once Trombi and Thorpe had a lawful basis to take Woods into custody, it was reasonable for them and the state agents to question Woods concerning the Schwab murders. The record indicates that Trombi, Thorpe, Ankenbrandt and Harker knew of information possibly linking Woods to the murders, and they considered him a suspect. The provisions of ch. 48, Stats., do not expressly prohibit questioning of a juvenile after he is taken into custody.

Woods also asserts that his detention resulting from the order that Gage signed was unlawful because Gage's alleged motivation in ordering his detention was to allow the officers to interrogate him, and that Gage's decision to order Woods' detention was therefore predetermined. We find no merit to this argument. Woods' detention was lawful, and once the officers lawfully had Woods in custody, they were entitled to question him. They did not need Gage's authorization to question Woods.

## THE ORAL STATEMENT

Woods argues that his oral statement is inadmissible because it was obtained in violation of the fifth and fourteenth amendments to the United States Constitution,[2] and Art. I, sec. 8 of the Wisconsin Constitution.[3]

---

[2] The fifth amendment to the United States Constitution provides:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the

He contends that he did not waive his right to counsel, and that even if he did, it was not a knowing and intelligent waiver. He also contends that his conduct constituted an assertion of his right to remain silent. Woods further argues that he did not waive his right to remain silent either expressly or through a course of conduct, and that even if a waiver of his right to remain silent could be inferred from his conduct, the waiver was not voluntarily made.

Prior to addressing those issues, it is appropriate to discuss the applicable standard of review. In reviewing the issues that Woods raises, an appellate court examines two determinations made by the trial court, but applies a different standard of review to each. First, the trial court determines the evidentiary or historical facts relevant to the issue in this case, namely, the circumstances

Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation".

The fourteenth amendment to the United States Constitution states, in part:

"Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[3] Article I, sec. 8 of the Wisconsin Constitution provides, in part:

"(1) No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself."

surrounding the giving of the oral statement. Second, the trial court then applies those facts to resolve the constitutional questions which, in this case, are whether Woods waived his rights, and whether the waivers were knowingly, intelligently and voluntarily made. *See State v. Carter,* 33 Wis. 2d 80, 88–91, 96, 146 N.W.2d 466 (1966) ; *State v. Hoyt,* 21 Wis. 2d 284, 305–06, 128 N.W. 2d 645 (1964) (Wilkie, J., concurring).

The standard of review by the appellate court of the trial court's findings of evidentiary or historical facts is that those findings will not be upset on appeal unless they are contrary to the great weight and clear preponderance of the evidence. *State v. Mazur,* 90 Wis. 2d 293, 309, 280 N.W.2d 194 (1979). This standard of review does not apply, however, to the trial court's determination of constitutional questions. Instead, the appellate court independently determines the questions of "constitutional" fact. *See Fare v. Michael C.,* 442 U.S. 707 (1979) ; *Mazur,* 90 Wis. 2d at 309–10. These questions are not questions of evidentiary or historical fact, but are rather questions that require "application of constitutional principles to the facts as found. . . ." *Mazur,* 90 Wis. 2d at 309, quoting *Brown v. Allen,* 344 U.S. 443, 507 (1953) (opinion of Frankfurter, J.). The rationale for the independent review of an ultimate question of "constitutional" fact has been explained as follows:

". . . Whether the defendant voluntarily made the confession is a matter of fact. However, it is a question of 'constitutional' fact which must be independently determined by this [appellate] court. A finding of voluntariness is a necessary condition of the use of a confession as evidence by the state, as a matter of federal constitutional law."
"The scope of constitutional protections, representing the basic value commitments of our society, cannot vary from trial court to trial court, or from jury to jury.

Reasonable men can differ as to whether a given confession was voluntary. Whatever the ultimate substantive dimension of these rights might be, they must be uniform throughout the jurisdiction. This can be accomplished only if one decision maker has the final power of independent determination. It is the task of this court to determine the voluntariness of a confession by applying certain standards articulated by the United States supreme court to the facts of the given case." *Hoyt*, 21 Wis. 2d at 305–306 (Wilkie, J. concurring).

In this case, therefore, the trial court's findings of evidentiary or historical facts surrounding the interrogation of Woods will not be overturned unless they are contrary to the great weight and clear preponderance of the evidence. However, we must independently determine whether Woods waived his rights to counsel and to remain silent, and if he did, whether under the totality of circumstances his waivers were knowingly, intelligently and voluntarily made.

*3. Did Woods Waive His Right To Counsel?*

The undisputed facts are that after Trombi read Woods his *Miranda* rights in the squad car, Trombi asked Woods if he understood his rights, to which Woods indicated by affirmative head gestures that he did. Trombi then asked Woods if he wished to consult an attorney, to which Woods shook his head "no".

Shortly after he was taken to the county jail, Woods was again asked by Gage if he wanted an attorney. Woods orally responded that he did not. The trial court concluded that Woods waived his right to counsel. We agree. Based on the trial court's findings and the undisputed facts, we conclude beyond a reasonable doubt that Woods waived his right to counsel prior to making the oral statement.

*4. Did Woods Assert His Right To Remain Silent By His Conduct?*

Woods contends that his conduct constituted an assertion of his right to remain silent, and therefore, the

officers' continued questioning, which led to his statements, was in violation of his constitutional rights. We disagree. We conclude, based on the undisputed facts, that Woods did not assert his right to remain silent. Because Woods did not assert his right to remain silent, the officers were entitled to continue their questioning because a reasonable person under the totality of circumstances could have believed that Woods' conduct indicated a state of mind that was in the process of determining whether to waive his right to remain silent and to answer questions.

Although courts have held that a defendant's silence after being advised of his right to remain silent is equivalent to an express assertion of that right,[4] that is not the case here. The undisputed facts indicate that Woods did not remain totally silent after he was advised of his rights. After Trombi read the *Miranda* rights to Woods in the squad car, he asked Woods if Woods understood each right, including the right to remain silent, to which Woods indicated by affirmative head gestures that he understod the *Miranda* rights. Thorpe also testified that he heard Woods say "uh huh", meaning "yes", after Trombi asked Woods if he understood his rights. Trombi asked Woods in the squad car if Woods wanted to consult an attorney, to which Woods indicated by shaking his head that he did not.

After Gage asked Woods if he had been informed of his rights, he asked if Woods wished to consult an attorney. Woods did not stand mute, but stated that he did not wish to consult an attorney. When Ankenbrandt later asked Woods if he had been informed of his constitutional rights, Woods again spoke by responding "yes".

After Trombi read Woods his rights in the squad car and Woods indicated that he did not wish to consult an

---

[4] *See, e.g., People v. Chavez,* 632 P.2d 574 (Colo. 1981); *State v. Vargus,* 373 A.2d 150 (R.I. 1977).

attorney, Trombi asked Woods if he wished to answer questions or make a statement. Woods did not respond at that point. Several times during their questioning of Woods at the station, Trombi and Thorpe asked Woods if he wanted to talk to them. Woods did not respond to those questions, although he had previously responded to other questions, such as when Trombi asked him in the squad car if he understood his rights. Woods also responded to a question Trombi asked concerning the Schwab murders. Trombi asked Woods why he went into the woods the day after the murders. Woods replied, "I never went into the woods the next day." At no time prior to or during the questioning did Woods indicate that he wanted the questioning to stop.[5]

---

[5] At the suppression hearing, Thorpe testified as follows:

"Q: At any time between the time that you arrived at the sheriff's department until you turned Mr. Woods over to the Justice Department agents, did you ever ask him if he wanted to talk to you?

"A: Yes.

"Q: When was that?

"A: During the questioning.

"Q: How far into the questioning when you said do you want to talk to us?

"A: I think several times during the questioning.

"Q: And that's because he wasn't answering anything, isn't that right?

"A: That's correct.

"Q: And you took from his silence that he didn't want to talk to you, isn't that right? (Emphasis added). (Sic).

"A: No.

"Q: Then why did you ask him repeatedly, (sic) talk to us?

"A: I believe I asked him, 'Don't you want to talk about it now?' and all he would do is stare down at the wall.

"Q: At one point he told you, 'No, I don't want to talk about it.', isn't that right?

"A: No. The only time that he made any verbal response whatsoever was when Officer Trombi asked him a question.

"Q: About whether he wanted to talk?

Woods' conduct, therefore, was neither total silence nor total responsiveness. However, the following undisputed facts indicate that Woods did not assert his right to remain silent: (1) Woods clearly indicated on a number of occasions that he understood his right to remain silent. (2) He indicated that he was aware of his right to have the police stop questioning him at any time. (3) Woods never indicated he wanted the questioning to stop. (4) The questioning was of a relatively short duration. (5) The police frequently asked Woods whether he wished to talk to them. It was from these facts that the police had to decide whether Woods was making up his mind to talk to them, or whether he was in effect asserting his right to remain silent.

The situation the police were confronted with was a difficult one: a suspect whose conduct and responses indicated neither the desire to remain silent nor the desire to answer. Woods' entire course of conduct could reasonably have been interpreted by the police to be a weighing by him of the decision to answer questions, not as an assertion of his right to remain silent. Given the serious implication of the questions propounded, Woods might well have wanted time to make up his mind. His decision may have hinged on a number of factors, including a desire on his part to know, to the extent the police questions might indicate, what evidence the police had implicating him. This is supported by the fact that at one point during questioning he denied being in the woods by the Schwab residence the day after the murders.

Given that Woods was aware of his right to remain silent, that he understood his right to stop the question-

---

"A: No, he asked him why he went into the woods to (sic) following day after the murders, and he said 'I never went in the woods the next day.' And that's the only verbal response he ever made when Officer Trombi and myself were in there at first."

ing at any time he desired, that he did not indicate by gestures or verbal responses that he wanted the questioning to stop, that he did make some oral responses, that the questioning was of relatively short duration, and that the police made frequent efforts to determine whether he wished to assert his right to remain silent, we conclude that Woods' conduct was not an assertion of his right to remain silent.

*5. Did Woods Waive His Right To Remain Silent?*

Woods contends that even if his conduct did not constitute an assertion of his right to remain silent, the state did not establish beyond a reasonable doubt that he waived that right. We disagree.

It is not constitutionally required that a defendant either orally or in writing expressly waive his rights to counsel or to remain silent. Silence coupled with an understanding of his rights and a course of conduct consistent with waiver may support the finding of a valid waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ; *Jordan v. State*, 93 Wis. 2d 449, 465, 287 N.W.2d 509 (1980).

As noted above, Woods' conduct up to the point when he began to give the incriminating oral statement was consistent with the conduct of a person going through the process of determining whether to answer questions. At the point that he began to answer the questions put to him, and thereby incriminate himself, he was clearly indicating that he had decided to waive his right to remain silent. As noted above, Woods did not remain totally silent during this period, but orally responded to some of the police questions. Additionally, Woods was informed on more than one occasion of those rights, and he indicated on two separate occasions that he understood them. His conduct during the questioning was such

that it was reasonable to believe he was making a determination whether he would waive his right to remain silent. Thus, when he began to respond fully to the questions propounded, he was implicitly informing the police he had made a decision to waive his right to remain silent and to answer their questions. The trial court found that Woods waived his right to remain silent. We agree. Based on the trial court's findings and the undisputed facts, we conclude beyond a reasonable doubt that Woods waived his right to remain silent.

*6. Under The Totality Of Circumstances, Were Woods' Waivers Of His Right To Counsel And His Right To Remain Silent Knowingly, Intelligently And Voluntarily Made?*

The trial court made several findings of evidentiary facts, including: (1) At the time Woods was taken into custody, he was sixteen years old, had completed one-half of tenth grade of high school, had normal or above average intelligence, and could read English; (2) At the time Woods was taken into custody and during the questioning, he was not tired or exhausted, and he appeared to be under no strain; (3) During questioning, Woods was not in restraints; (4) Woods made no requests for food or drink. Based on these and other findings, the trial court found that Woods had the capacity to make a knowing and intelligent waiver of his rights. The court of appeals determined that the trial court's findings of evidentiary facts were not contrary to the great weight and clear preponderance of the evidence. We do not review that determination of the court of appeals. *See Winkie, Inc. v. Heritage Bank,* 99 Wis. 2d 616, 621, 299 N.W.2d 829 (1981).

■

We do, however, independently examine those facts to determine whether, as a matter of federal constitutional law, Woods' waivers were knowingly, intelligently and

voluntarily made. A determination whether an accused knowingly, intelligently and voluntarily waived his rights depends on the totality of circumstances surrounding the interrogation. This "totality of circumstances" analysis applies even when the individual who was interrogated is a juvenile. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Relevant factors to be considered include the juvenile's age, experience, education, background, intelligence, and the capacity to understand the warnings given, the nature of his fifth amendment rights, and the consequences of waiving those rights. *Fare*, 442 U.S. at 725. The state has the burden of proving beyond a reasonable doubt that an accused knowingly, intelligently and voluntarily waived his *Miranda* rights. *State v. Hernandez*, 61 Wis. 2d 253, 258, 212 N.W.2d 118 (1973).

Woods argues that the waiver of his right to counsel was not a knowing and intelligent waiver, and he cites various reasons to support his assertion. He contends that he did not knowingly and intelligently waive his right to counsel because he was not told why he had been taken into custody until the questioning began, and he did not know the reason he was to be interrogated when he indicated to Thorpe and Trombi in the squad car, and later to Gage, that he did not wish to consult an attorney. There is no indication in the record that Trombi, Thorpe or Gage specifically informed Woods at the time he was taken into custody and prior to his waiver of counsel that he would be questioned about the Schwab murders. However, we conclude that there is no merit to Woods' assertion. Even if Woods did not know that he would be questioned about the murders at the time he waived his right to counsel, that does not render his oral statement inadmissible. *See United States v. Anderson*, 533 F.2d 1210, 1212 n. 3 (D.C. Cir. 1976).

Woods also contends that his statement to Ankenbrandt and Harker to the effect that he could not afford an attorney which he made after he gave the oral statement but before he gave the written statement, reflects that he did not fully understand his right to counsel at the time he waived it. This contention is without merit. The fact that Woods indicated at a later point in time after he gave the oral statement that he could not afford an attorney in no way indicates that he lacked the capacity or knowledge to make a knowing and intelligent waiver of his right to counsel prior to the time he made the oral statement. The trial court determined that Woods knowingly and intelligently waived his right to counsel. We agree. We conclude, based on the trial court's findings and the undisputed facts in the record, that under the totality of circumstances, Woods knowingly and intelligently waived his right to counsel.

Woods also cites various reasons why the waiver of his right to remain silent was not voluntarily made. We shall address each of the reasons he cites separately.

a. Misrepresentations Made By The Police.

Woods argues that the officers made certain misrepresentations during the questioning which resulted in an involuntary waiver of his right to remain silent. The issue raised is one this court has never squarely addressed: the effect of a misrepresentation made by officers to a suspect during interrogation on the voluntariness of a subsequent waiver of the right to remain silent.

Prior to reaching the issue of the effect of misrepresentation on the waiver of a right to remain silent, we must first determine whether the officers' statements that Woods refers to were, in fact, misrepresentations. It is undisputed that during Thorpe's and Ankenbrandt's questioning of Woods, they made statements to the effect

that they had more evidence against Woods linking him to the Schwab murders than they actually had. It is also undisputed that during Ankenbrandt's and Harker's questioning of Woods, Ankenbrandt showed him Henry Schwab's wallet and a fingerprint card with two circles drawn around the prints. Ankenbrandt tapped the fingerprint card and wallet and said to Woods something to the effect that "this is what's going to pin you down". The first statements were clearly misrepresentations, because the officers later testified that they knew them to be false at the time they made the statements. In addition, the statements were of a type that could reasonably have created a misimpression in Woods' mind. The second alleged misrepresentation is of a somewhat different nature, in that the statement by the police was an indication that evidence existed which the police at that time did not positively know to be untrue. We conclude, however, that this was also a misrepresentation. The officers made the statement without regard to its truth, and it was also of a type likely to create a misimpression in the defendant's mind.

We now consider the effect of these misrepresentations on the voluntariness of Woods' waiver of the right to remain silent. Woods argues that the voluntariness of any waiver of his *Miranda* rights and of his oral confession was vitiated by these misrepresentations. Woods cites the following language from *Miranda* to support his assertion: ". . . any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 U.S. at 476. We do not agree, however, that this dictum established a *per se* rule that any misrepresentation that police make during questioning automatically renders a waiver of the right to remain silent involuntary, or a confession inadmissible.

In the four cases the Supreme Court decided in conjunction with its opinion in *Miranda,* the court was not confronted with factual situations involving the effect of alleged misrepresentations made during custodial interrogation on the voluntariness of a waiver of the right to remain silent, or on the admissibility of a subsequent confession. In *Frazier v. Cupp,* 394 U.S. 731, 739 (1969), however, the court considered the effect of misrepresentations by police on the admissibility of a confession and held that the misrepresentations were insufficient to render an otherwise voluntary confession inadmissible. In *Frazier,* the misrepresentations were viewed in terms of their effect on the voluntariness of a confession and whether the confession would be admissible, given the totality of circumstances surrounding the confession. We conclude that this approach is applicable to a consideration of the effect of misrepresentation by police on the voluntariness of a waiver of a defendant's right to remain silent as well. Given the decision in *Frazier,* and the emphasis in *Miranda* on voluntariness, we do not believe that the court in *Miranda* adopted a per se rule that the existence of misrepresentations by police during custodial interrogation automatically renders a waiver of the right to remain silent involuntary or a confession given after a waiver of that right inadmissible.

In *Schilling v. State,* 86 Wis. 2d 69, 271 N.W.2d 631 (1978), an interrogating officer referred to a murdered victim's wallet and suggested to the defendant that his fingerprints might be found on it. Because we concluded that there was no misrepresentation under the circumstances, we did not reach the issue of the effect of an actual misrepresentation by the police during interrogation on a waiver of the right to remain silent. We noted, however, that in *Frazier,* the United States Supreme Court held that even an actual misrepresentation by an

interrogator does not ipso facto make a confession inadmissible. *Id.*

In *State v. Cooper*, 217 N.W.2d 589, 597 (Iowa 1974), the Iowa Supreme Court discussed the effect of misrepresentation on the voluntariness of a waiver of rights and concluded:

"Deception of any nature by representatives of the state cannot be condoned. However, we conclude deception standing alone does not render a waiver of constitutional rights involuntary as a matter of law unless the deceiving acts amount to a deprivation of due process. Nevertheless, deception becomes a factor to be considered in reviewing the totality of the circumstances in making the determination as to the voluntariness of the waiver even though the act does not per se produce exclusion."

The court also indicated that the test of voluntariness is whether the officers' behavior was such as to overbear the defendant's will and bring about a confession not freely self determined. 217 N.W.2d at 596.

Other courts that have considered the effect of misrepresentation on the voluntariness of a waiver have addressed the test of voluntariness in terms of "overbearing the defendant's will to resist,"[6] or "deprivation of due process."[7] These courts have generally held that misrepresentation is but one factor to consider under the totality of circumstances.[8] We agree. The effect of misrepresentation on the voluntariness of a waiver of the right to remain silent, like a determination of the effect of misrepresentation on the voluntariness of a confession, is dependent upon the totality of circumstances.

We hold that when police have made a misrepresentation during interrogation of a suspect prior to a waiver

---

[6] *See State v. Jacoby*, 260 N.W.2d 828 (Iowa 1977); *Thessen v. State*, 454 P.2d 341, 347 (Alaska 1969).

[7] *See State v. Cooper*, 217 N.W.2d 589 (Iowa 1974).

[8] *See, e.g., State v. Jacoby*, 260 N.W.2d 828 (Iowa 1977).

of the right to remain silent, and the suspect then waives that right, the state must establish beyond a reasonable doubt that under the totality of circumstances, the waiver was voluntarily made. The test of voluntariness is whether the individual or cumulative effect of the misrepresentations under the totality of circumstances created such pressure on the suspect as to overcome his free will. If the state fails to meet its burden, the waiver of the right to remain silent is involuntary, and any statement obtained must be suppressed. The totality of circumstances that must be considered include factors such as age, intelligence, education, whether the suspect was advised of his rights, duration of the interrogation, the conditions under which the interrogation was conducted, and the suspect's capacity to understand the nature of the rights given and the consequences of waiving those rights. An additional circumstance to be considered and weighed carefully when misrepresentation is involved is the nature of the misrepresentation itself, that is, whether the misrepresentation was of a type that would lead a defendant to believe that it might be necessary to waive the right to silence in order to benefit or protect himself or to protect someone he would have reason to want to protect.

Whether the effect of the misrepresentation under the totality of circumstances created pressure sufficient to overcome a suspect's free will is a determination that must be made on a case by case basis. The court must decide whether the defendant's ability to make a free and reasoned choice was impaired. In *Haynes v. Washington*, 373 U.S. 503, 515 (1963), the Supreme Court indicated that a determination of voluntariness requires an assessment of the effect of the police practice on the "mind and will of an accused." The pressures created may not be so great that the suspect's will may be considered to be "overborne", or his capacity to make a rational choice

impaired. *See Miranda,* 384 U.S. at 507, n. 4 (Harlan, J., dissenting).

This holding is consistent with decisions by other courts that have addressed the issue of the effect of misrepresentation on the voluntariness of a confession. For example, in *People v. Boerckel,* 385 N.E.2d 815 (Ill. 1979), police misrepresented to the defendant that his fingerprints had been found at the scene of the crime. The defendant then confessed to the crime and subsequently argued that his confession was coerced and involuntary. The court indicated that the test of voluntariness of a confession is whether it was made freely and without compulsion. The court held that the misrepresentation did not render the confession involuntary. Similarly, in *State v. Winters,* 556 P.2d 809 (Ariz. App. 1976), police misrepresented to the defendant that his fingerprints matched those found at the scene of the crime. The defendant confessed to the crime, and argued that his confession was involuntary. The court stated that voluntariness must be viewed in relation to the totality of circumstances, and that a statement induced by fraud or trickery is not involuntary unless there is additional evidence that the defendant's will was overborne or that the confession is unreliable. The rationale for applying those principles to the issue before us is the same.

In this case, we conclude that under the totality of circumstances, the effect of the misrepresentations, individually or cumulatively, did not create such pressure on Woods as to overcome his free will or render his waiver involuntary. The misrepresentations were not of a type that would create pressure sufficient to overbear Woods' will, or to impair his ability to make a free and reasoned choice. There was nothing in the nature of the misrepresentations, implicit or in fact, to lead Woods to

believe it might be necessary to waive his right to silence in order to benefit or protect himself or to protect another he would have reason to want to protect. In addition, when the misrepresentations are viewed in conjunction with the other circumstances in this case, such as Woods' age and intelligence, his alert condition during the questioning, the short duration of the questioning, and the lack of threats or physical abuse, it is evident that Woods' ability to make a free and reasoned choice was not impaired by the fact that misrepresentations were made.

b. Use Of Photographs Of Victims.

Woods argues that Trombi and Thorpe's use of a photograph album containing pictures of the Schwabs taken after the murders rendered his waiver and confession involuntary. The album was lying open on a table in the room in which Woods was questioned, and was situated approximately one to two feet away from him. The trial court found that the officers used no force to compel Woods to look at the pictures, and concluded that the use of the photograph album did not render Woods' waiver involuntary.

We have addressed the issue of the use of photographs of victims during questioning of suspects in the context of determining the voluntariness of a defendant's confession. In *McKinley v. State,* 37 Wis. 2d 26, 154 N.W.2d 344 (1967), and *Bradley v. State,* 36 Wis. 2d 345, 153 N.W.2d 38 (1967), we condemned the practice of taking a defendant to the morgue for a "corpse indentification", and indicated that such a practice might render a confession involuntary. In *State v. Wallace,* 59 Wis. 2d 66, 207 N.W.2d 855 (1973), we cautioned against officers' use of gruesome photographs ". . . as a substitute for morgue identification of victims of criminal acts." 59 Wis. 2d at 85. We held, however, that the use of photographs of a corpse during interrogation of the defendant did not render the defendant's confession involuntary.

We do not sanction the use of gruesome photographs of victims during questioning of an accused. We conclude, however, that the use of such photographs is but one factor to consider in the totality of circumstances when determining the voluntariness of a waiver of *Miranda* rights and of a subsequent confession.

As we recognized in *Wallace,* there is a difference in impact between morgue viewings and photographs. The sudden effect of viewing the actual corpse is much more dramatic than being seated near photographs of a murder victim. In addition, in both *McKinley* and *Bradley,* the morgue viewings were of victims who were either a relative or friend of the defendants, which presumably would create a more emotional impact than if the victim was unknown to the defendant.

In this case, the trial court found that Woods was never forced to look at the photographs. There is nothing in the record to indicate that Woods even looked at the pictures. The photographs also were of victims who were neither relatives nor friends of Woods. It is reasonable to assume that the use during questioning of pictures of victims who are friends or relatives of a defendant could create a more emotional atmosphere than if the pictures are of victims who have no personal connection with the defendant. We conclude that the use of the photograph album did not overbear Woods' will to resist, and did not render Woods' waiver and confession involuntary.

c. Pretended Friendly Gesture.

Woods also asserts that Harker exploited his personal characteristics by putting a hand on his shoulder when Woods began to cry, and that this gesture was part of the alleged coercive techniques that prompted him to waive his rights and confess. During the suppression hearing, Harker indicated that he knew at the time he questioned

Woods that a "fatherly approach" might be effective with Woods. The trial court concluded that this gesture did not render Woods' waiver involuntary. We agree. Harker's fleeting gesture, when viewed under the totality of circumstances, cannot be construed as having an effect on Woods' decision to waive his right to remain silent and give the oral statement. We conclude that it did not act to overbear Woods' will or render his waiver or confession involuntary.

d. Alleged Promises And Threats.

Woods finally contends that the voluntariness of his waiver of rights and of his oral confession was negated by the officers' use of promises and threats during the questioning. Woods alleges that Trombi made comments to the effect that it would be "better" or "easier" for Woods if he talked. At the suppression hearing, Trombi's testimony, which is undisputed, indicated that he did not make any promises or threats to Woods.[9] The undisputed

---

[9] At the suppression hearing, Trombi testified as follows:

"Q: At any time during your questioning of Mr. Woods did you make any threats or promises to him?

"A: No, I did not."

Trombi also testified:

"Q: And you told him [Woods] that anyone who would do this was sick, isn't that right?

"A: I don't recall saying that.

"Q: You told him that if he would tell you that he did it that you would get help—get him help, isn't that right?

"A: Again I don't recall saying that.

"Q: That things would be better if he would talk to you?

"A: I no doubt would have said something to that effect.

"Q: Things would go easier on him if he were to talk to you, is that right?

"A: I may have made some mention along that line, but specifically that, no.

"Q: Did you tell him that if he talked to you he might stay in the juvenile court system and not be tried as an adult?

"A: No, I do (sic) not.

facts indicate that Trombi made no promise to Woods of leniency or of an improved position in the legal system if he confessed, which are the type of promises that may invalidate a subsequent confession. *See, e.g.,* White, *Police Trickery in Inducing Confessions,* 127 U. Pa. L. Rev. 581, 621 (1979).

Woods also refers to Ankenbrandt's statement when he showed Woods the wallet and fingerprint card to the effect that "this is what's going to pin you down." This statement was not made in a threatening context. The statement was made as part of the fingerprint ploy that Ankenbrandt used to create the inference that Woods' fingerprints had been found on Schwab's wallet. This could not be considered a threat as that term is normally used to determine whether a waiver of rights and a confession were coerced by promises or threats. A threat for those purposes normally conveys a message that some harm or detriment will occur to the defendant or his friends, or that the defendant's situation will worsen if he does not confess.

Woods has cited no other alleged promises or threats that the officers may have made during the questioning, and the record reveals none. Based on the undisputed facts, we conclude that the statements alluded to by Woods did not render his waiver invalid or his confession involuntary.[10]

---

"Q: Did you talk to him about what would happen to him in the juvenile justice system?

"A: No, I did not. . . ."

[10] The dissent's portrayal of the facts surrounding this interrogation requires response.

The facts as presented by the dissent create an impression that the atmosphere surrounding the interrogation of this person nearly 17 years old with normal to above average intelligence was permeated with undue psychological domination and force. Because of that impression created by the dissent, a reader could be inexorably drawn to the dissent's conclusion: suppress the con-

7. *Did Woods Have Statutory And Constitutional Rights To Counsel?*

Besides the right to counsel referred to in the above sections, Woods contends that at the time he was taken

fession because the state "overcame his mind and will by psychological domination and deprived him of the freedom to decide whether or not to assist the state in securing his conviction." *(See* Abrahamson, J., dissenting op. at 739).

However, a reading of the entire record in this case, including lengthy testimony by all the officers involved in the questioning as well as the intake worker, reveals a far different atmosphere than that portrayed by the dissent. The flavor that comes out of this entire record is that of scrupulous adherence to the rights of the suspect . . . and for good reason. These law enforcement officials were faced with a terrible dilemma. They had reached an impasse in their investigation. Although they suspected Woods of this double murder, they had no evidence to connect him to the brutal double slayings. They hoped that if Woods was guilty, a confession could be obtained. They also realized that if they obtained a confession, it would have to hold up through review by a trial court, as well as the appellate process, because if it was thrown out, Woods would go free.

The entire record reflects police officers who were determined that if a confession was obtained, it would withstand appellate scrutiny; it would be only after all of Woods' rights were accorded him, that it would be a free and voluntary exercise of his will, and that it would be reliable. They withheld evidence from the public during the investigation so that if Woods' confession did give detail, it would only be detail that the murderer alone would know. They gave Woods his rights not once, not twice, but a minimum of three times during the course of the detention and 45–50 minute interrogation. The intake worker, upon first seeing Woods, immediately asked for and received assurances from Woods that he understood his rights. The officers acceded to Woods' every request. The place of interrogation was well ventilated and well lighted. Woods was not bound in any manner.

The dissent states that Woods "cried at one point", but the uncontradicted testimony of one of the officers gives a different picture: ". . . a few tears rolled down his cheeks." The dissent states that the law enforcement officers used threats and promises to obtain the confession, but the uncontradicted testimony of officer Trombi is that no promises or threats were made to Woods.

into custody and questioned, he had statutory and constitutional rights to counsel, and that these rights were

The dissent states that gruesome photographs were displayed, but the record reveals that the photos in question were $3\frac{1}{2}'' \times 5''$ in size and were placed in a photograph album approximately one to two feet from where Woods was seated. In addition, the trial court found that Woods was never forced to look at them. Woods himself never contradicted any of the testimony offered by the officers at the suppression hearings. Never once did he testify that he was coerced, frightened, or intimidated into this confession. Never once did he give the trial court or any reviewing court any subjective testimony as to the state of his mind, or deny that this confession was freely and voluntarily given. Never once did he testify as to how any pictures or friendly gesture or any of the other things referred to in the dissent overcame his free will. He could have done so at the suppression hearings without in any manner, shape, or form waiving his right against self-incrimination. He chose not to do so.

The dissent states that "the majority misapplies the totality of the circumstances test by isolating and analyzing in a vacuum each aspect of the interrogations . . . thus failing to consider together, i.e. in the totality, all aspects of the interrogation and the personal characteristics of the suspect." (Abrahamson, J., dissenting op. at 744). That is incorrect. In applying the totality of circumstances test, we must look at the whole record. When that is done, as it was done here by the majority, what comes through is police officers taking the greatest care to make sure that Woods' confession was not coerced or suggested, nor the product of ignorance of his rights nor of adolescent fantasy, fright or despair. *See In re Gault*, 387 U.S. 1, 55 (1967).

Efforts by the police to obtain confessions from suspects are a legitimate and sometimes absolutely essential (as here) police activity. There is nothing inherently unfair, suspect, or wrong in those efforts. In attempting to obtain a statement from a suspect, the police will frequently be met with a myriad of unforeseen and complex situations that call for immediate decisions on their part for which little guidance has been provided. They do not have the quiet atmosphere of a Supreme Court chamber nor the benefit of weeks of reflective thought to make those decisions. They must make their decisions immediately and then hope that a court, when reviewing their efforts under the totality of circumstances, will find their decisions to be reasonable and constitutional. We have and we do.

violated. Woods argues that his statutory right to counsel stems from sec. 48.23(1)(a), Stats. He also asserts that under *Kirby v. Illinois,* 406 U.S. 682 (1972), he had a right to counsel under the sixth and fourteenth amendments to the United States Constitution[11] because formal adversary judicial proceedings allegedly were initiated when Gage ordered his temporary detention.

We conclude that the right to counsel under sec. 48.23 (1), Stats., did not attach during the detention and subsequent questioning of Woods. Section 48.23(1) provides, in pertinent part:

"**Right to counsel.** (1) RIGHT OF CHILDREN TO LEGAL REPRESENTATION. Children subject to proceedings under this chapter shall be afforded legal representation as follows:
"(a) Any child alleged to be delinquent under s. 48.12 or held in a secure detention facility shall be represented by counsel at all stages of the proceedings, but a child 15 years of age or older may waive counsel provided the court is satisfied such waiver is knowingly and voluntarily made and the court accepts the waiver. . . ."

"Proceedings" is not defined in ch. 48. Section 990.01(1) relating to general rules of statutory construction, provides that all words and phrases shall be construed according to common and approved usage, except that technical words and phrases and others having a peculiar meaning shall be construed according to that meaning. The common and approved usage of a word in a statute may be ascertained by reference to a recognized diction-

---

[11] The sixth amendment to the United States Constitution provides, in part:
"In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence."
The sixth amendment is applicable to the states through the due process clause of the fourteenth amendment. *See Gideon v. Wainwright,* 372 U.S. 335, 342–43 (1963).

ary. *Kollasch v. Adamany*, 104 Wis. 2d 552, 563, 313 N.W.2d 47 (1981).

Webster's Third New International Dictionary 1807 (1961) includes the following definition of "proceedings": "e (1) . . . the course of procedure in a judicial action or in a suit in litigation: legal action." Black's Law Dictionary 1368 (1968) defines "proceeding" as: ". . . the form and manner of conducting juridical business before a court or judicial officer. . . ." These definitions indicate that "proceedings" within sec. 48.23(1), Stats., are legal proceedings before the court. This interpretation is consistent with the language of sec. 48.23 (1), providing that a juvenile may waive counsel under that provision only if the court determines that the waiver was knowingly and voluntarily made, and accepts the waiver.

We conclude that neither the temporary custody order that Gage signed, nor the custodial interrogation of Woods, were "proceedings" within the meaning of sec. 48.23(1)(a), Stats., for which counsel was required. When a juvenile alleged to have committed a delinquent act is taken into custody and not immediately released, he is referred to an intake worker who performs an intake inquiry. *See* secs. 48.20(3) and 48.24. The intake worker reviews the need to hold the juvenile in custody. Sec. 48.20(7)(b). If the intake worker does not release the juvenile, a judicial hearing is held pursuant to sec. 48.21 to determine if the juvenile court will order that the juvenile be held in custody.

If at the time the juvenile is taken into custody he is alleged to have committed a delinquent act, the intake worker must also determine whether the juvenile should be referred to juvenile court for delinquency proceedings. Upon determining that such referral is necessary, the intake worker requests that the district attorney, corporation counsel, or other official specified in sec. 48.09,

Stats., file a petition under sec. 48.25. That section provides, in relevant part: "**Petition: authorization to file.** (1) A petition *initiating proceedings* under this chapter shall be signed by a person who has knowledge of the facts alleged. . . ." (Emphasis added.) If the juvenile alleged to be delinquent is temporarily held in custody and entitled to a detention hearing under sec. 48.21, the delinquency petition under sec. 48.25 must be filed by the hearing date. Section 48.21 (2) also discusses proceedings under ch. 48 and provides: "PROCEEDINGS CONCERNING RUNAWAY OR DELINQUENT CHILDREN. *Proceedings* concerning a child who comes within the jurisdiction of the court under s. 48.12 . . . shall be conducted according to this subsection." (Emphasis added.)

The above provisions indicate that the first "proceeding" at which Woods would have been entitled to counsel under sec. 48.23 (1), Stats., was a court hearing under sec. 48.21 to determine whether to continue to hold him in custody. When a juvenile is brought into custody and ordered detained by an intake worker, there are no court proceedings until a hearing is held pursuant to sec. 48.21. If the intake worker requests that the district attorney file a delinquency petition, the court also becomes involved in the delinquency proceedings after the petition is filed and when formal hearings are held to determine the juvenile's status. There are no proceedings before the juvenile court under ch. 48, however, when a juvenile is ordered to be placed in temporary custody after he is taken into custody, and if the juvenile is questioned by police officers at that time.

We also conclude that because formal adversary judicial proceedings had not been initiated against Woods when he was taken into custody, he had no sixth or fourteenth amendment right to counsel at the time he was

questioned. The sixth and fourteenth amendment right
to counsel applies only to criminal prosecutions. In *Kirby
v. Illinois,* the United States Supreme Court held that
this right to counsel attaches only at or after the time
that adversary judicial proceedings have been initiated
against a defendent. 406 U.S. at 688. The court indicated
that in its prior decisions involving the sixth and four-
teenth amendment right to counsel, ". . . all of those
cases have involved points of time at or after the initia-
tion of adversary judicial criminal proceedings—whether
by way of formal charge, preliminary hearing, indict-
ment, information, or arraignment." 406 U.S. at 689.

The court also noted that the initiation of judicial
criminal proceedings is the starting point of our system
of adversary criminal justice. It is only then that the
government has committed itself to prosecute, and only
then ". . . that the adverse positions of government and
defendant have solidified." *Id.* The court therefore de-
clined to import into a routine police investigation a
sixth and fourteenth amendment right to counsel, which
it stated was historically applicable only after the onset
of ". . . formal adversarial proceedings." *Id.*

When Woods was taken into custody, the intake worker
signed a temporary custody order. That did not mean,
however, that "adversary judicial criminal proceedings"
had been initiated against him at that point. Under ch.
48, Stats., the analog to the "commitment to prosecute"
cited in *Kirby is* the filing of a delinquency petition under
sec. 48.25. The filing of a petition in juvenile court
constitutes a formal criminal charge against the juve-
nile, for it only at that point that the juvenile is charged
with violating a state or federal criminal law. It is also
at that point that the state commits itself to "prosecut-
ing" the juvenile, and the adverse positions of the gov-
ernment and juvenile solidify. Until the petition is filed,

the state has made no formal decision to commence delinquency proceedings against the juvenile.

We hold that Woods did not become the subject of a "criminal prosecution" within the meaning of the sixth amendment until a formal petition was filed under sec. 48.25, Stats., which alleged him to be delinquent. Because he was not the subject of any procedure approximating a criminal prosecution at the time Gage signed the temporary detention order, any sixth and fourteenth amendment right to counsel he may have had did not attach when he gave the oral statement. The statement therefore was not obtained in violation of that constitutional right.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). Burdette Woods was a juvenile—16 years, 9 months of age—and inexperienced with criminal proceedings; he was suspected of murder; his arrest and detention on an unrelated theft charge were illegal or at least pretextual; no parents or other relatives were present during his questioning; law enforcement officers used misrepresentation, promises, threats, and gruesome photographs of the death scene in their questioning; Woods was in custody approximately three and one half hours before making a statement; Woods responded in the negative when asked if he wanted counsel, but he also said he could not afford counsel; Woods remained silent for about 50 minutes of questioning and allegedly waived his right to remain silent by giving a statement.

The issue in this case is whether Burdette Woods voluntarily waived his right to counsel and his right to remain silent or the state overcame his mind and will by psychological domination and deprived him of the freedom to decide whether or not to assist the state in secur-

ing his conviction. In the absence of a valid waiver of rights, Woods's statements to the police must be suppressed.

Woods's constitutionally protected interest at issue in this case is his right to decide, free from unfair pressure, whether he wants to speak and whether he wants an attorney. *Schoeffler v. State,* 3 Wis. 717 [*823], 735 [*844] (1854). The fundamental value at stake is that the suspect not be deprived before trial by unfair methods of interrogation of rights guaranteed to him at trial, *e.g.,* his privilege not to testify, his right not to be compelled to be a witness against himself, his right to counsel. Thus in determining the question of voluntariness, the court evaluates whether the police practices impose an intolerable degree of pressure upon the will of the suspect and are contrary to standards of governmental fair play.

This was a gruesome crime. The perpetrator should be punished. But the gravity of the crime does not obviate police responsibility to conduct an interrogation that conforms to constitutional standards. The law relating to police interrogation and the admissibility of confessions attempts to resolve the competing claims of crime detection and fairness to the suspect. Both victims of crime and victims of government excess must be protected by the courts. A suspect must be afforded the safeguards our jurisprudence has developed for the administration of criminal justice, safeguards which are at once protective of the individual and of society.

The standard of review is twofold: the appellate court first reviews the trial court's findings of facts to determine if they are clearly erroneous. Then the appellate court, viewing the totality of the circumstances, makes its own determination of the constitutional issue of the validity of the waivers. It need not give weight to the conclusion of the trial court. A waiver is knowing, intel-

ligent, and voluntary when the suspect appreciates the consequences of the decision to waive.[1] Courts must indulge every reasonable presumption against waiver of constitutional rights. *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938).

I accept the trial court's findings of the historical facts. I set forth these findings in the margin at note 2.[2] They are not clearly erroneous. Indeed the historical facts are undisputed.

---

[1] The terms "voluntary," "free from fear or coercion," and "free and rational choice" embrace "a wide range or complex of values which modern confession law considers and seeks to maximize. Many recent pronouncements instruct us to construe 'voluntariness' as a shorthand expression indicative of these values." 3 Wigmore, *Evidence* sec. 826, p. 350–51 (Chadbourn rev. 1970). *See Wold v. State,* 57 Wis. 2d 344, 353–54, 204 N.W.2d 482 (1973); White, *Police Trickery in Inducing Confessions* 127 U.P.L. Rev. 581, 593–96 (1979); Comment, *The Coerced Confession: Cases in Search of a Rationale,* 31 U. Chi. L. Rev. 313 (1964); Developments, *Confessions,* 79 Harv. L. Rev. 938 (1966); secs. 140.4, 150.2 (6), and Commentary, Model Code of Pre-Arraignment Procedure (Proposed Official Draft, April 15, 1975).

The questions whether the waivers were voluntarily, knowingly and intelligently made and whether the statement was voluntary, although discrete inquiries, often shade into each other. Both questions involve similar concepts of knowledge, intelligence, and voluntariness and both are governed by the totality of the circumstances test.

[2] The trial court issued a comprehensive memorandum decision in which it made the following finding of facts relating to the waiver and statements:

"The following facts are made to a standard of beyond a reasonable doubt, primarily as they address themselves to the issue of whether or not the defendant was given the appropriate Miranda Rights and whether or not they in fact were waived by the defendant. The court would find that the defendant at the time of the alleged commission of the crimes was aged 16; had finished one half of the 10th Grade of high school; was in normal classes; and that he was at least of normal or above normal intelligence as indicated by his mother. It's further found that the defendant was arrested at approximately 7:30 a.m., and was in bed sleeping.

Viewing the circumstances of this in-custody inter-
rogation in their totality and using the beyond the rea-
sonable doubt standard the majority sets forth, I am not
persuaded that the waivers were the products of Woods's

From this the court would infer that the defendant was, therefore,
not tired or exhausted at the time of the interrogation. It's found
that the defendant on the way to the Sheriff's Department was
given his rights as prescribed in the famous case of *Miranda v.
Arizona.* He arrived at the station at approximately 8:00 a.m. and
was seen by the Intake Worker, Mr. Gage. The Court further
finds that the defendant was acquainted with Mr. Gage, and at
that time Mr. Gage asked if he had been given his rights and if
they had been read to him, as indicated on the bottom of the sheet
the defendant indicated they had. He was asked whether he
wished to have an attorney and he stated that he did not. Subse-
quent to his discussion with Mr. Gage, the Intake Worker, the
defendant was then questioned by the two state investigators at
approximately 10:00. Said questioning lasting for approximately
20 minutes before the defendant gave him an oral statement, fol-
lowed by a written statement, which for reasons cited above has
been suppressed. The court would find also that the state agents
asked the defendant if he had previously been given his rights, and
the defendant responded he had. The court further finds that both
the grandparents and the tribal president knew where the defend-
ant was at the time that he was in custody. It's found further that
the defendant was acquainted with Mr. Gage and that Mr. Gage
asked him and reminded him about his rights. It is further found
that the defendant appeared to be under no strain at the time;
was not crying; and appeared subdued. It's further found that the
defendant made no requests for food, drink, attorneys, or any
indications that he wished to remain silent, with the exception of
the remark concerning the fact that he could not afford an attor-
ney after the state agents gave him his rights after his oral state-
ment but prior to his written statement. It's further found that
during questioning the defendant was not in restraints; never indi-
cated that he wanted to talk to anyone; or wanted to talk to a
lawyer. It's further found that the defendant was given cigarettes
immediately upon request, and in addition was allowed immedi-
ately to go to the bathroom upon his request.
 " . . .
"This court will find by evidence beyond a reasonable doubt, in
addition to those things found above, that the defendant was shown

free and rational choice of whether to make a statement or otherwise cooperate. *Greenwald v. Wisconsin,* 390 U.S. 519, 521 (1968).

The United States Supreme Court has said that "[i]f counsel was not present for some permissible reason when an admission was obtained [from a juvenile], the greatest care must be taken to assure that the admission was voluntary in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *In re Gault,* 387 U.S. 1, 55 (1967). *See also Fare v. Michael C.,* 442 U.S. 707, 725 (1979); *Haley v. Ohio,* 332 U.S. 596, 599 (1948).

The law enforcement officers did not exercise the "greatest care" in this case. There was no scrupulous adherence to Woods's rights. The record shows that the law enforcement officers deliberately used unacceptable "tricks of interrogation" in getting Woods to waive his

certain pictures which have been admitted into evidence. There is no direct evidence as to what specific pictures were shown, but one must assume that they were pictures showing the deceased, as they were found in their home. The court further finds that the defendant was shown the deceased's wallet and a fingerprint card with two circles drawn around prints, and was told something to the effect that this is what would get him. The court would further find beyond a reasonable doubt that there was no force used to compel the defendant to look at the pictures, and that there was no coercion, duress or violence used on him. It is further found that although the mother asked to see the defendant, the court finds that he had already given his oral confession before the mother was in the police station. It is further found that the pictures were shown to the defendant during the first interrogation by the county officers, and that the fingerprint card and wallet were shown to the defendant by the state officers. There is no direct evidence to indicate that the pictures were put away by the county officers, but there is strong inferences that this happened when one considers the testimonies found on pages 36, 92 and 156. There is no evidence whatsoever that the pictures were shown to the defendant by the state officers."

right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 448–455 (1966). I therefore dissent.

The "totality of the circumstances" standard requires a court to weigh the tactics and pressures to which the suspect was subjected to induce the waiver against the suspect's power to resist such pressures. That which would be overpowering to the young, the inexperienced, or the weak might not faze a mature, experienced criminal. *Grennier v. State,* 70 Wis. 2d 204, 210, 234 N.W.2d 316 (1975); *State v. Wallace,* 59 Wis. 2d 66, 81, 207 N.W.2d 855 (1973).

The majority misapplies the totality of the circumstances test by isolating and analyzing in a vacuum each aspect of the interrogations in this case, thus failing to consider together, i.e., in the totality, all aspects of the interrogation and the personal characteristics of the suspect. The majority recognizes that several facets of the case signal the possibility of coercion. The majority does not, however, look at them together. Although no one facet of this case standing alone necessarily invalidates a waiver in this case, all the facets viewed together —and that is what we mean by the totality of the circumstances—compel the conclusion that Woods's waivers were not made knowingly, intelligently, and voluntarily.

The circumstances of these in-custody interrogations to be considered in their totality are the following:

*1: Personal characteristics.* Woods was 16 years, 9 months of age at the time of his arrest; he was halfway through the tenth grade; according to his mother, he had normal or above average intelligence; he could speak and write English; he came from a broken home and resided in Shawano county with his grandparents. The interrogating officers testified that although Woods was controlled during interrogation, he also "became quite emotional" and cried at one point. Woods had no previous experience with the criminal justice system.

The personal characteristics of the defendant are significant insofar as they render him vulnerable to the particular type of psychological pressure, inducement, or stratagem used in the interrogation. Woods's age and his inexperience with the criminal justice system made him more vulnerable to the stratagems police used in this case to induce the waivers and increase the probability that the waivers were not made knowingly, intelligently, and voluntarily.

*2: Custody and interrogation.* Woods was in custody approximately three and a half hours before making an oral or written statement. Law enforcement officers arrived at Woods's home between 7:00 and 7:30 a.m. while he was sleeping. They arrested him for theft and took him to the police station, arriving at about 8:00 a.m. He was booked and made to change from street clothes into jail clothes. Woods apparently was not left alone at any time at the police station. He met with Gage, a juvenile intake worker, and then was questioned in an interrogation room, first by two local police officers and then by two state agents from the Department of Justice. Woods gave an oral statement just before 11:00 a.m. and a written statement sometime between 11:00 and 11:30 a.m.

Here the interrogations lasted a relatively short period, probably less than an hour, but in this time there were two interrogations, by two relays of officers, with two-on-one questioning in each relay. The use of two relays of two officers doing the questioning and the total length of custody indicate psychological domination when considered along with such factors as Woods's age, isolation from family and friends, the nature of the crime, and interrogation involving misrepresentation and gruesome photographs.

*3: No parent present.* Neither Woods's mother nor his grandparents were present at the time of interrogation.

Without a parent or guardian or attorney present, the juvenile is, of course, more susceptible to "inherently coercive pressures" which "undermine" the "will to resist" and "compel him to speak where he would not otherwise do so freely," *Miranda v. Arizona,* 384 U.S. 436, 467 (1966). This court has said that although the presence of parent, guardian, or attorney is not an absolute requirement for a minor to waive his or her right to remain silent, the absence of adult advice does raise the possibility of coercion and should be considered in the totality of circumstances. *Theriault v. State,* 66 Wis. 2d 33, 41, 44, 223 N.W.2d 850 (1974). Commentators have urged that the absence of parental or other adult advice should weigh more heavily than other factors in the totality of the circumstances evaluation.[3]

*4: Suspect not advised of the charge.* Initially Woods shook his head "no" and orally said "no" when asked if he wanted an attorney. When Woods waived his right to counsel, he had not yet been told that he was suspected of murder and would be questioned about the murders.

Since a suspect may be willing to be without counsel in questioning on one charge but not on another, more serious one, ignorance of the exact subject of the interrogation is significant in the court's evaluation of the

---

[3] Bailey, Note, *Waiver of Miranda Rights by Juveniles: Is Parental Presence a Necessary Safeguard?,* 21 J. Fam. L. 725 (1982–83). For a discussion of the need for presence of an adult *see* Grisso, *Juveniles' Capacity to Waive Miranda Rights: An Empirical Analysis,* 68 Calif. L. Rev. 1134 (1980); Flicker, *Providing Counsel for Accused Juveniles,* 14 (Institute of Judicial Administration and Juvenile Justice Standards Implementation Project, A.B.A. Section on Criminal Justice) (1983).

According to the record, Woods's mother did arrive at the police station at about 11 a.m. and asked to see Woods but police denied permission because he was being interrogated. After Woods made his statement, he was given an opportunity to see his mother, but he did not wish to do so.

total circumstances of whether the waiver of counsel was made knowingly, intelligently, and voluntarily. *Carter v. Garrison,* 656 F2d 68 (4th Cir 1981). *See also United States v. McCrary,* 643 F.2d 328 (5th Cir 1981) ; *Schenk v. Ellsworth,* 293 F. Supp. 26, 29 (D. Mont. 1968).

*5: Suspect asserts inability to afford counsel.* When asked later in the interrogation if he wanted an attorney, Woods responded that he could not afford an attorney. The interrogation nevertheless continued and a written statement was taken from Woods. The trial court correctly suppressed this written statement because Woods's right to counsel had been violated.

In view of Woods's youth and inexperience with the criminal justice system, I conclude, as I explained in point 4, that when he made the initial negative response to the question whether he wanted counsel, he may have thought that he was going to be questioned about theft of a chain saw, not murder. Thus his waiver cannot be said to have been made intelligently. I further conclude that Woods's later response that he could not afford counsel indicates, under all the circumstances described herein, that his initial waiver of his right to counsel was without understanding that he was entitled to counsel at public expense.

*6: Suspect asserts right to remain silent by being silent.* Woods never expressly stated he was waiving his right to remain silent. Indeed he made no statement to the interrogating officers for approximately 50 minutes of the interrogation other than one isolated response to a leading question. Despite Woods's silence and despite the *Miranda* warning which advises both the suspect and the law enforcement officers that the accused has a right to remain silent, the officers persisted in questioning him and encouraging him to talk. The majority concludes that Woods's conduct of neither total silence nor total responsiveness did not constitute an as-

sertion of the right to remain silent but indicated that he was trying to make a decision about whether to speak or remain silent. The majority holds that Woods's confession after at least 50 to 60 minutes of interrogation constituted his waiver of the right to remain silent.

Waiver of the rights protected by *Miranda* must be "clear and explicit." *Schilling v. State,* 86 Wis. 2d 69, 85, 271 N.W.2d 631 (1978). I conclude that Woods's conduct until his confession was an exercise of his right to remain silent. *See United States v. Hayes,* 385 F.2d 375 (4th Cir. 1967). The majority fails to consider Woods's steadfast silence and this alleged waiver in light of the cumulative effect of all that occurred before the confession. Considered in light of Woods's personal characteristics and the techniques used in questioning, Woods's confession did not constitute a waiver of his right to remain silent; if it did, it was not the product of free will.

*7: Pretended friendly gesture.* One of the interrogators placed his hand on Woods's shoulder in a friendly gesture.

An interrogator's taking on a nonadversary role is recognized as a very effective technique to induce suspects to forget they are in an adversary situation. *See* White, *Police Trickery in Inducing Confessions,* 127 U. Pa. L. Rev. 581, 614–17 (1979).

In the totality of the circumstances, considering Woods's age and the fact that he was from a broken home and isolated from family and friends, he was especially likely to succumb to this strategy and cooperate. The significance of the gesture in this case is clearly set forth in the record. An officer testified he used this gesture because he had been told that Woods would be more likely to talk to a "strong father figure." Woods gave his statement shortly after this gesture.

*8: Police misrepresentations that guilt is known.* Woods was subjected to what the majority concedes were police misrepresentations that the police had evidence establishing his guilt.

The device of impressing the suspect with the interrogators' certainty of guilt is a very effective interrogation technique designed to make the suspect "yield to the majority judgment." White, *Police Trickery in Inducing Confessions*, 127 U. Pa. L. Rev. 581, 624–25 (1979). Both the state and the majority opinion recognize that such misrepresentations are unacceptable police conduct. *See Blaszke v. State*, 69 Wis. 2d 81, 88–89, 230 N.W.2d 133 (1975); *State v. Cooper*, 217 N.W.2d 589, 597 (Iowa 1974). Woods's age and inexperience in the criminal justice system, along with the gruesome photographs, friendly gesture, promises and threats, and isolation from family, made Woods particularly vulnerable to this technique to induce a waiver of his right to remain silent.

*9: Gruesome death scene photographs displayed.* The police had many gruesome death scene photographs in an album on the table when they were questioning Woods. The trial court found as a matter of historical fact that the local law enforcement officers showed these photographs to the defendant. See trial court findings of fact at note 2.

This court has cautioned law enforcement officers against the use of gruesome photographs of the crime scene because such photographs unfairly impair the suspect's capacity to make a rational choice. *State v. Wallace,* 59 Wis. 2d 66, 207 N.W.2d 855 (1973). I conclude that the photographs—in combination with such other factors as Woods's youth, the absence of a family member, the friendly gesture, and the misrepresentations—impaired his ability to make a rational choice whether to remain silent or speak.

*10: Promises and threats used.* Woods was told something to the effect that things would "be better" or "easier for him" if he confessed or talked to the police. Woods was also told, "This is what is going to pin you down," or "This is what's going to hang you," when he was shown fingerprints, supposedly his, taken at the scene of the murder.

The effect of these words which imply threat or promise must be judged in light of their being directed to a juvenile who is being questioned about murders and led to believe that the state has conclusive evidence of guilt. This type of pressure is likely to exert substantial influence upon the suspect's will and cause the decision to waive rights to be the result of outside pressure rather than a consequence of rational decision. This court has warned against the use of such tactics and strategies. *Blaszke v. State,* 69 Wis. 2d 81, 88–89, 230 N.W.2d 133 (1975).

*11: Arrest on theft charge pretextual.* Regardless of whether there was probable cause to arrest for theft,[4] Woods's arrest for theft was a pretext. The majority and the state in effect concede that the authorities wanted Woods in custody to question him not about the theft but about the murders. The state's brief acknowledges that at the time of arrest the authorities had focused on Woods as the prime suspect in the murders but had no probable cause to arrest Woods on that charge.

---

[4] Woods's arrest for theft was invalid because it was not based on probable cause. The majority decides that probable cause existed to arrest Woods for theft and receiving stolen property because Woods possessed a chain saw that had been stolen 17 months earlier, he attempted to sell it for a low price, and his attempt to sell was unsolicited and made to someone who didn't even know Woods's correct surname. Probable cause cannot be found under such tenuous circumstances. Because there was no probable cause to arrest Woods, his statement should be suppressed as the fruit of an illegal arrest.

Whether or not the pretextual nature of the arrest for theft should invalidate the arrest or the statements, it does indicate the law enforcement officers' eagerness to get custody of the defendant and their willingness to use devious methods in order to question Woods about the murders and solve the case. The record clearly shows that the interrogators were prepared to use deception to deprive Woods of the opportunity to make a rational choice whether to speak to the police.

*12: Juvenile detention order of questionable validity.* Woods asserts that the juvenile intake worker, contrary to his obligations under chapter 48, was involved in the law enforcement officers' pretext to detain Woods on the theft charge but question him about the murders.

The juvenile intake worker testified that he was not so involved; the law enforcement officers testified that he was. The circuit court made no finding. The state urges this court to review the record and make a finding.[5] The majority opinion is silent on this issue.

I believe that this court cannot make a finding because the record contains contradictory testimony as to whether the juvenile intake worker was in league with the police and their subterfuge.

For purposes of this review of the totality of circumstances, it is sufficient for me to note that, according to

---

[5] The state's brief asserts that the reported decisions are divided on whether a Wisconsin appellate court can supply a factual finding not made by the trial court. The state cites the following cases as supporting the proposition that an appellate court can make the finding: *State v. Fillyaw*, 104 Wis. 2d 700, 711, 312 N.W.2d 795 (1981); *Termination of Parental Rights to T.R.M.*, 100 Wis. 2d 681, 688, 303 N.W.2d 581 (1981); *State v. Kramer*, 99 Wis. 2d 306, 316, 298 N.W.2d 568 (1980); *Walker v. Walker*, 40 Wis. 2d 313, 319, 161 N.W.2d 898 (1968). The state cites the following cases as supporting the proposition that an appellate court cannot make the finding: *Wurtz v. Fleischman*, 97 Wis. 2d 100, 107, 108 n. 3, 293 N.W.2d 155 (1980), and *State v. Drogsvold*, 104 Wis. 2d 247, 257, 311 N.W.2d 243 (Ct. App. 1981).

the record, the juvenile intake worker did not act as the legislature mandated in chapter 48. Chapter 48 provides that the person "taking a child into custody shall make every effort to immediately release the child," sec. 48.20 (2), and that the juvenile intake worker must make a probable cause determination, sec. 48.205, Stats. 1981–82, as to release of the child. The juvenile intake worker here did not make any effort to release Woods immediately and did not make a probable cause determination of whether the child was within the jurisdiction of the court and, unless detained, would run away, as required by sec. 48.205, 1981–82. Furthermore, the intake worker is required to inform the child what allegations he is facing. Sec. 48.243 (1) (a). The intake worker's knowing failure to tell Woods that he was being detained for questioning about the murders contributed to Woods's inability to make a knowing, intelligent waiver of his rights. Since it appears that the juvenile intake worker may have failed to comply with chapter 48, violation of the juvenile code is a factor to be considered in evaluating the strategem of the interrogators and the voluntariness of the waiver.

When the circumstances are examined in their totality, I am not satisfied that the interrogation of this particular 16-year-old, in this particular situation, meets the constitutional standards. I conclude that the waivers, if any, were not voluntary.[6] I dissent.

[6] I do not reach the issue of whether Woods had right to counsel under sec. 48.23(1) (a), Stats. 1981–82.